UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

FREDERICK TREESH,             )       Case No.:  1:02 CV 462
                                )
     Petitioner            )
                                )       JUDGE SOLOMON OLIVER, JR.
         v.              )
                                )
MARGARET BAGLEY, WARDEN,   )
                                )       MEMORANDUM OPINION
     Respondent        )       AND ORDER

This matter is before the court upon Frederick Treesh's ("Treesh") Petition ("Petition") under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (ECF No. 22). Treesh alleges twenty-seven grounds for relief in his Petition.  Also before the court are Respondent's Return of Writ (ECF No. 31) ("ROW"), Treesh's Traverse To Respondent's Return Of Writ ("Traverse") (ECF No. 51) and Treesh's Motion for Evidentiary Hearing (ECF No. 67).

For the reasons which follow, the court denies the Petition.

## I. INTRODUCTION

Appellant, Treesh, appeals from his convictions and sentence of death for the aggravated murder of Henry Dupree.

## II. FACTUAL BACKGROUND

The facts, as stated by the Ohio Supreme Court, are as follows:

Appellant, Frederick Treesh, and two companions, Keisha Harth and Benjamin Brooks, departed Cleveland on August 27, 1994, to smoke crack cocaine in an Ashtabula hotel room. They returned to Cleveland later that day to purchase additional drugs. While there, the group picked up another man, Anthony Washington, who agreed to assist them. After a "couple hours" of driving and smoking cocaine, the group decided to rob a business to finance the purchase of more cocaine.

Washington eventually directed the group to the Vine Street News, an adult bookstore in Eastlake, Lake County. Treesh and Brooks were armed with a nine-millimeter handgun and a sawed-off shotgun. The handgun was loaded to maximum capacity with "Hydra-Shok" bullets, designed for penetration and maximum stopping power. Before Treesh and Brooks entered the bookstore, Harth handed Treesh a roll of duct tape that Treesh planned to use to restrain the robbery victims.

Treesh and Brooks entered the Vine Street News at approximately 11:30 p.m. After glancing at a few magazines, Treesh and Brooks approached the sales counter where Louis Lauver worked. Treesh pulled out the nine-millimeter handgun, cocked it, pointed it at Lauver, and ordered him not to move or call out for help. Treesh then asked Lauver where the security guard was, and Lauver motioned toward the rear of the store. Treesh walked through swinging doors into the restricted area at the rear of the store and placed the handgun inside his pants. At this point, Lauver lost sight of Treesh. A short time later, however, Lauver heard four gunshots coming from the rear of the store.

Treesh testified that after passing through the swinging doors into the rear portion of the store, he saw two customers behind a rack, looking at magazines, and saw the store security guard, Henry Dupree, sitting in a chair, watching television. At first, neither Dupree nor the customers appeared to notice Treesh's presence. Treesh took the gun out of his pants, poked Dupree in the shoulder with the gun, and ordered Dupree to stand up. Startled, Dupree complied. Treesh testified that he originally intended to take Dupree to the front of the store and tape him up with the clerk, but then noticed handcuffs on Dupree's pants and decided to use them. According to Treesh, a struggle ensued when he reached for Dupree's handcuffs, and the handgun discharged.

While Treesh was in the rear of the store, Brooks ordered Lauver to empty the cash register. Lauver complied, and Brooks demanded that Lauver open the safe. As Lauver explained that this was impossible, shots rang out from the back of the store and Treesh came rapidly back through the swinging doors. Brooks quickly left with the money from the cash register. Lauver

stood by the counter with his hands in the air as Treesh headed toward the exit.  Before reaching the door, Treesh brought the handgun up, pointed it at Lauver, and fired at least two shots.  Bullets struck Lauver in the jaw and forearm.  Treesh later testified that he aimed these shots not at Lauver, but at the telephone on the wall behind the counter.

After Treesh left the store, Lauver temporarily lost consciousness, but awoke shortly thereafter and dialed 911.  Dupree, grievously injured during his encounter with Treesh at the rear of the store, managed to make his way through the swinging doors, but collapsed on the floor behind the counter. An autopsy later confirmed that Dupree died as a result of two close-range gunshot wounds in his chest. Lauver survived and testified at trial.

Paul Forner, a witness across the street at a drive-up pay telephone, saw two men enter the Vine Street News.  Minutes later, Forner heard popping sounds and saw the two men leave.  Forner rushed to the store and found Lauver on the phone with the police.  Because Lauver was wounded in the face and had difficulty speaking, Forner gave the dispatcher a description of the suspects and their vehicle.  Dale Plunkard, a store customer who hid in a viewing booth during Treesh's encounter with Dupree, heard three or four shots in steady succession, "one right after another," and then emerged from the booth to find Dupree unconscious.  Like Forner, Plunkard was able to identify the suspects' vehicle, which he had seen parked nearby before he entered the store.

Sergeant Ronald Stih of the Euclid Police Department received a dispatch concerning the armed robbery.  Stih scanned traffic on Interstate 90, spotted a vehicle matching the dispatcher's description, and followed it off the interstate.  Officer Frederick Stoldt of the Euclid Police Department also pursued the suspects' car.  The vehicles attained speeds of over sixty miles an hour in a residential neighborhood.  As Washington drove the suspects' car, Treesh shot out its rear window, and both Brooks and Treesh fired shots through the opening and over the tops of the cruisers to discourage pursuit. Eventually, however, Washington lost control of the car and crashed.

According to Sergeant Stih, Treesh assumed an "action stance" as he got out of the car and pointed his handgun at Stih. Treesh fired the weapon at Stih and Stoldt at least three times.  Stih retreated and radioed for help.  Treesh fired additional shots while running away with Harth.  Brooks remained in the car and was immediately apprehended.

Officers Michael Janusczak and Harold Pretel of the Cleveland Police Department arrived at the scene, obtained descriptions of Treesh and Harth, and pursued the two suspects on foot.  Eventually, the officers approached

3

a garage, where Pretel saw Treesh aiming a gun at him.  Pretel ordered Treesh to drop the weapon.  Treesh threw the gun down, but attempted to flee over a fence.  Several officers confronted Treesh as he jumped over the fence and ordered him to the ground.  Officer Janusczak testified that as he handcuffed Treesh, he immediately advised Treesh of his *Miranda* rights.

The police transported Treesh first to Euclid, then to the Eastlake Police Department.  On the way to Eastlake, Treesh heard on the police radio that Dupree had died.  Treesh later testified that he was not aware prior to that time that he had even shot Dupree.

Treesh arrived at Eastlake just after 2:00 a.m. on August 28.  Treesh testified that he felt "high" and "paranoid" at that time. Lieutenant Thomas Doyle of the Eastlake Police Department and Federal Bureau of Investigation Special Agent Robert Alvord conducted a series of interviews with Treesh and Brooks at Eastlake.  Some of these interviews were captured on the station house videotape recorder.  Portions of these videotapes, which contained several inculpatory statements, were later played for the jury.  At approximately 2 p.m. on August 28, Doyle confronted Treesh and Brooks with the store clerk's statement, and the suspects refused to discuss their participation in the Vine Street News robbery any further without an attorney present.  Treesh and Brooks continued to discuss their involvement in other crimes.

The Lake County Grand Jury returned a seven-count indictment against Treesh on August 29, 1994.

*State v. Treesh*, 90 Ohio St. 3d 460 (2001).

### III. PROCEDURAL HISTORY

A Lake County jury found Treesh guilty of one count of aggravated murder with two aggravating circumstances, two counts of attempted aggravated murder, one count of felonious assault, and one count of aggravated robbery.  Each of these five counts included a firearm specification.  The court *nolled* count six, which had alleged that Treesh failed to comply with the order or signal of a police officer.  Treesh pleaded guilty to count seven, carrying a weapon while under a disability.

At the conclusion of the penalty phase, the jury recommended that the court sentence Treesh

4

to death.  The trial court adopted the jury's recommendation.  *State v. Treesh*, No.95-22542 (Lake

Com. Pleas Mar. 2, 1995).  Treesh timely appealed the decision of the trial court to the Lake County

Court of Appeals, which affirmed his convictions and death sentence.

> A.  *Direct Appeal*

Treesh's direct appeal of his conviction and sentence to the Ohio court of appeals raised the

following grounds of error:

> Assignment of Error I: Trial court erred to the prejudice of appellant by
> denying the appellant's motion for transfer of venue.
>
> Assignment of Error II: Trial court erred to the prejudice of appellant in not
> suppressing statements made by him to law enforcement officers and
> evidence obtained from those statements.
>
> Assignment of Error III: The trial court erred to the prejudice of the appellant
> by denying the appellant's motion to dismiss due to missing and intentionally
> destroyed evidence.
>
> Assignment of Error IV: The trial court erred to the prejudice of the appellant
> by denying the appellant's motion to produce record of grand jury
> proceedings.
>
> Assignment of Error V: The trial court erred to the prejudice of the appellant
> by failing to provide appellant with daily transcripts.
>
> Assignment of Error VI: The trial court erred to the prejudice of the appellant
> by denying the appellant's motion to increase the number of peremptory
> challenges.
>
> Assignment of Error VII: The prosecutor's misconduct during voir dire
> violated appellant's rights under the Fifth, Sixth, Eighth and Fourteenth
> Amendments to the U.S. Constitution and §§ 9, 10, and 16, Article I of the
> Ohio Constitution.
>
> Assignment of Error VIII: The Sixth and Fourteenth Amendments to the U.S.
> Constitution and §§ 10 and 16, Article I of the Ohio Constitution guarantee
> an accused a fair trial and an impartial jury.  The inclusion of juror Lynn
> Volke denied appellant these constitutional guarantees.

5

Assignment of Error IX: The trial court committed prejudicial error by allowing the appellee to argue in an improper and inflammatory manner during the guilt phase before the jury, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution and §§ 9, 10 ,and16, Article I of the Ohio Constitution.

Assignment of Error X: The trial court committed prejudicial error by overruling two motions for acquittal made by appellant, in violation of appellant's rights as guaranteed him by the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution and §§ 9 and 10, Article I of the Ohio Constitution.

Assignment of Error XI: Appellant was denied his right to a fair trial and due process by the trial court's denial of his motion for mistrial in violation of the Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution and §§ 5, 9, 10, and 16, Article I of the Ohio Constitution.

Assignment of Error XII: Appellant was denied his Sixth, Eighth and Fourteenth Amendments rights as guaranteed by the U.S. Constitution and §§ 9 and 10, Article I of the Ohio Constitution to a fair trial, due process and a reliable determination of his guilt and sentence when gruesome, prejudicial, and cumulative photographs were admitted into evidence even though their prejudicial effect outweighed their probative value.

Assignment of Error XIII: The trial court erred to the prejudice of the appellant by denying his motion for a mistrial after the prosecution referred to appellant's prior acts.

Assignment of Error XIV: The trial court committed prejudicial error by allowing the appellee to argue in an improper and inflammatory manner during the first portion of the appellee's summation in the guilt phase before the jury, in violation of appellant's rights as guaranteed him by the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution and §§ 9, 10 and 16, Article I of the Ohio Constitution.

Assignment of Error XV: Ineffective assistance of counsel provided to appellant violated his rights to a fair and impartial jury trial and sentence, as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution and §§ 5, 9, 10, and 16, Article I of the Ohio Constitution.

Assignment of Error XVI: The jury and the trial court erred to the prejudice of the

6

appellant because there was insufficient evidence for the court to find him guilty of aggravated murder and/or attempted aggravated murder beyond a reasonable doubt.

Assignment of Error XVII (A): The trial court committed prejudicial error by allowing victim impact testimony to be heard by the jury during the mitigation phase in this case, over the objection of the appellant, in violation of appellant's rights as guaranteed him by the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution and §§ 5, 9, and 10, Article I of the Ohio Constitution.

Assignment of Error XVII (B): The trial court erred to the prejudice of the appellant by failing to allow a defense witness to testify during the mitigation phase of the trial relating to the gravity of the threat the appellant would pose to the community if he were allowed to live and to be incarcerated as opposed to being put to death.

Assignment of Error XVIII: The trial court erred to the prejudice of the appellant by holding that any and all aggravating circumstances presented concerning the aggravated murder of Mr. Dupree outweighed the mitigating factors presented during the penalty phase of the trial.

> 1. The aggravated murder of Mr. Dupree did not outweigh, beyond a reasonable doubt, the mitigating factors presented during the penalty phase of the trial.

> 2. The imposition of the death sentence against appellant violated the requisite proportionality of death sentences, pursuant to Ohio Rev. Code Ann. § 2929.05(A).

Assignment of Error XIX: The trial court erred in imposing the death sentence on Treesh. The Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution and §§ 2, 9, 10, and 16, Article I of the Ohio Constitution establish the requirements for a valid death penalty scheme. Ohio's statutory provisions governing imposition of the death penalty contained in Ohio Rev. Code Ann. §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05, do not meet the prescribed requirements and thus are unconstitutional, both on their face and as applied to appellant.

> 1. The death penalty authorized by the Ohio Revised Code deprives capitally-charged defendants of their lives without due process of law, denies equal protection and imposes cruel and unusual punishment in violation of the Ohio and United States Constitutions.

7

2. Ohio Revised Code §§ 2929.022, 2929.03, and 2929.04 violate the appellant's rights to effective assistance of counsel and to a trial before an impartial jury, as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution, and §§ 9, 15, and 16, Article I of the Ohio Constitution.

3. Ohio Revised Code §§ 2929.022, 2929.03, and 2929.04 violate the Eighth and Fourteenth Amendments to the U.S. Constitution, and §§ 9 and 16, Article I of the Ohio Constitution by failing to provide adequate guidelines for deliberation, leaving the jury without proper guidelines in balancing the aggravating circumstances and mitigating factors.

4. Ohio Revised Code §§ 2929.022, 2929.03 and 2929.04 and Rule 11(C)(3) of the Ohio Rules of Criminal Procedure placed an unconstitutional burden on the appellant's rights to a jury trial under the Sixth and Fourteenth Amendments to the U.S. Constitution, and § 10, Article I of the Ohio Constitution and his rights to be free from compulsory self-incrimination under the Fifth and Fourteenth Amendments to the U.S. Constitution and § 10, Article I of the Ohio Constitution.

5. Ohio Revised Code § 2929.03 fails to provide a meaningful basis for distinguishing between life and death sentences, as it does not explicitly require a jury, when it recommends life imprisonment, to specify the mitigating factors found, or to identify its reasons for such sentence. This denied appellant his rights under Ohio Revised Code § 2929.03(A), the Ohio Constitution, and the Federal Constitution.

6. Ohio Revised Code §§ 2929.021, 2929.03, and 2929.05 fail to assure adequate appellate analysis of arbitrariness, excessiveness, and disproportionality of death sentences and the Ohio Supreme Court fails to engage in a level of analysis that ensures against arbitrary death sentencing.

7. The appellate review provision of Ohio Revised Code § 2929.05 fails to specifically require inquiry and findings regarding arbitrariness, passion, or prejudice, and thus is constitutionally inadequate under the Eighth and Fourteenth Amendments to the U.S. Constitution, and §§ 9 and 16, Article I of the Ohio Constitution.

8. The Ohio death penalty statute impermissibly mandates imposition of the death penalty and preludes a mercy option in the absence of mitigating evidence or when aggravating circumstances outweigh

8

mitigating factors. The statute also fails to require a determination that death is the appropriate punishment.

9. Ohio Revised Code §§ 2929.03, 2929.04, and 2929.05 violate the Eighth, and Fourteenth Amendments to the U.S. Constitution, and §§ 9 and 16, Article I of the Ohio Constitution by failing to require the jury to decide the appropriateness of the death penalty.

10. The Ohio death penalty scheme permits imposition of the death penalty on a less than adequate showing of culpability by failing to require a conscious desire to kill, premeditation, or deliberation as the culpable mental state.

11. The Ohio "beyond a reasonable doubt" standard of proof fails to meet the requirement of higher reliability for the guilt determination phase of a capital case.

12. The aggravating circumstance the appellant was charged with committing, Ohio Rev. Code Ann. § 2929.04(A)(7), is constitutionally invalid when used to aggravate Ohio Revised Code § 2903.01(B), aggravated murder.

13. Ohio Revised Code §§ 2929.03, 2929.04, and 2929.05 violate the Eighth and Fourteenth Amendments to the U.S. Constitution, and §§ 9 and 16, Article I of the Ohio Constitution by failing to properly allocate the burden of proof during mitigation phase of the trial.

Assignment of Error XX: The trial court erred to the prejudice of the appellant by failing to declare Ohio Revised Code § 2929.04(A)(7) unconstitutional as it applied to count one, aggravated murder as indicted, under Ohio Revised Code § 2903.01(B).

The Ohio court of appeals affirmed the convictions and the sentence. *State v. Treesh*, No. 95-L-057 (11th Ct. of Appeals Oct. 19, 1998). In dissent, Judge O'Neill concluded that Treesh had never received proper *Miranda* warnings, and that absent the inferences drawn from Treesh's improperly obtained statements, the State could not prove the lack of mitigating factors beyond a reasonable doubt. Thereafter, Treesh appealed to the Ohio Supreme Court, which affirmed his

conviction and sentence. *Treesh*, 90 Ohio St. 3d 460 (2001). Before the Ohio Supreme Court, Treesh raised the following grounds of error:

> *Proposition of Law No. 1:* A defendant is entitled to a change of venue, pursuant to Rule 18 of the Ohio Rules of Criminal Procedure and applicable law, when the incident in question is highly publicized locally and nationally.

> *Proposition of Law No. 2:* A defendant is entitled to the suppression of statements made by him to law enforcement officers and subsequent evidence obtained from the defendant when such were collected in violation of his rights guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 10 and 14 of the Ohio Constitution.

> *Proposition of Law No. 3:* A trial court must dismiss an indictment when evidence establishes that critical evidence is missing and/or intentionally destroyed by or in the possession [*sic*] the State of Ohio.

> *Proposition of Law No. 4:* A defendant in a capital punishment criminal matter is entitled to require the State of Ohio to produce the record of the grand jury proceedings.

> *Proposition of Law No. 5:* A defendant in a death penalty criminal case is entitled by law to have daily transcripts of any and all proceedings provided to him.

> *Proposition of Law No. 6:* A defendant in a death penalty criminal case is entitled to an increase in the number of peremptory juror challenges.

> *Proposition of Law No. 7:* A prosecutor's conduct during voir dire in violation of a defendant's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United State [*sic*] Constitution and §§ 9, 10, and 16, Article I of the Ohio Constitution.

> *Proposition of Law No. 8:* The inclusion of juror Lynn Volke denied appellant his rights pursuant to the Sixth and Fourteenth Amendments to the United States Constitution and §§ 10 and 16, Article I of the Ohio Constitution, which guarantee an accused a fair trial and an impartial jury.

> *Proposition of Law No. 9:* A trial court commits prejudicial error by allowing the State of Ohio to argue in an improper and inflammatory manner during the guilt phase before the jury, in violation of the Fifth, Sixth, Eighth, and

Fourteenth Amendments to the United States Constitution and §§ 9, 10, and 16, Article I of the Ohio Constitution.

*Proposition of Law No. 10:* A trial court commits prejudicial error by overruling the motions for acquittal made by a defendant, in violation of the defendant's rights as guaranteed him by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and §§ 9 and 10, Article I of the Ohio Constitution.

*Proposition of Law No. 11:* A defendant is denied his right to a fair trial and due process by a trial court's denial of his motion for mistrial in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and §§ 5, 9, 10, and 16, Article I of the Ohio Constitution.

*Proposition of Law No. 12:* A defendant is denied his Sixth, Eighth and Fourteenth Amendment rights as guaranteed by the United States Constitution and §§ 9 and 10, Article I of the Ohio Constitution to a fair trial, due process and a reliable determination of his guilt and sentence when gruesome, prejudicial, and cumulative photographs were admitted into evidence even though their prejudicial effect outweighed their probative value.

*Proposition of Law No. 13:* A trial court errs to the prejudice of a defendant when it denies a motion for mistrial after the prosecution referred to the defendant's prior acts.

*Proposition of Law No. 14:* A trial court commits prejudicial error by allowing a prosecutor to argue in an improper and inflammatory manner during the first portion of the State of Ohio's summation in the guilt phase before the jury, in violation of the defendant's Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and §§ 9, 10, and 16, Article I of the Ohio Constitution.

*Proposition of Law No. 15:* Ineffective assistance of counsel provided to a defendant violate [*sic*] his rights to a fair and impartial jury trial and sentence, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and §§ 5, 9, 10, and 16 of the Ohio Constitution.

*Proposition of Law No. 16:* A jury and trial court err to the prejudice of a defendant when there is insufficient evidence for the trier of fact to find him guilty of aggravated murder and/or attempted aggravated murder beyond a reasonable doubt.

> *Proposition of Law No. 17:* A trial court commits prejudicial error by allowing victim impact testimony to be heard by the jury during the mitigation phase of a death penalty case, over the objection of the defendant, in violation of the defendant's rights as guaranteed to him by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and §§ 5, 9, and 10, Article I of the Ohio Constitution.

> *Proposition of Law No. 18*: A trial court errs to the prejudice of a defendant when it fails to allow a defense witness to testify during the mitigation phase of the trial relating to the gravity of the threat the defendant would pose to the community if he were allowed to live and to be incarcerated as opposed to being put to death.

> *Proposition of Law No. 19:* The trial court erred to the prejudice of the appellant when it rules [*sic*] that any and all aggravating circumstances presented concerning the aggravated murder of Mr. Dupree outweighed the mitigating factors presented during the penalty phase of the trial.

> *Proposition of Law No. 20:* A trial court errs in imposing the death sentence on a defendant. The Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and §§ 2, 9, 10, and 16, Article I of the Ohio Constitution establish the requirements for a valid death penalty scheme. Ohio's statutory provisions governing the imposition of the death penalty, contained in Ohio Revised Code §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05, do not meet the prescribed requirements and thus are unconstitutional, both on their face and as applied to the Appellant.

> *Proposition of Law No. 21:* The trial court erred to the prejudice of the appellant by failing to declare Ohio Revised Code § 2929.04(A)(7) unconstitutional as it applied to Count One, aggravated murder as indicted, pursuant to Ohio Revised Code § 2903.01(B) and thereby, dismissing Specification II of Count One.

The United States Supreme Court denied Treesh's Petition for a Writ of Certiorari. *State v. Treesh*, 553 U.S. 904 (2001).

B.    *Post-Conviction Proceedings*

Treesh then filed a post-conviction petition with the trial court. His petition was summarily dismissed without an evidentiary hearing on December 18, 1998. *Ohio v. Treesh*, No. 97-L-080,

12

1998 WL 964528 (Ohio App. 11th Dist. Dec. 18, 1998). Treesh appealed that decision to the Ohio court of appeals raising the following claims of error:

> I. The trial court committed prejudicial error by failing to address all of the causes of action propounded by [appellant] in his amended petition in violation of [R.C.] 2953.21(F).

> II. The trial court erred by denying [appellant's] first cause of action asserting ineffective assistance of counsel relating to the trial attorneys' failure to introduce evidence to negate the purposeful requirement of aggravated murder.

> III. The trial court erred by denying [appellant's] second cause of action asserting ineffective assistance of counsel relating to the trial attorneys' failure to request the appointment of its own blood spatter expert.

> IV. The trial court erred by denying [appellant's] third cause of action asserting ineffective assistance of counsel relating to the trial attorneys' failure to obtain a report and expert testimony of its appointed neurologist.

> V. The trial court erred by denying [appellant's] fourth cause of action asserting ineffective assistance of counsel and conflict of interest with respect to trial attorney Hawkins' dual representation of [appellant] and Detective Thomas Doyle, a key witness of the state.

> VI. The trial court erred by failing to grant a post conviction [*sic*] hearing regarding previously excluded testimony of trial attorney [Albert] Purola at the mitigation phase of the trial.

> VII. The trial court erred by denying [appellant's] fifth, sixth, eighth, ninth, and tenth causes of action as asserted in his amended petition, thereby violating his federal and state constitutional rights.

The court of appeals affirmed the trial court's denial of post-conviction relief on December 18, 1998. *State v. Treesh*, 1998 WL 964528 (Ohio App. 11th Dist. Dec. 18, 1998). The Ohio Supreme Court dismissed Treesh's appeal from the court of appeals' decision on the ground that it contained no substantial constitutional question. *State v. Treesh*, 85 Ohio St. 3d 1476 (1999).

> C.    *Habeas Corpus*

13

On June 10, 2002, Treesh filed this Petition for Writ of Habeas Corpus.  (ECF No. 22.)  In

his Petition, Treesh identified twenty-seven grounds for relief.  These are:

FIRST GROUND FOR RELIEF

> *Treesh Was Denied Due Process and a Fair Trial When His Request for a Change of Venue Was Denied, and He Was Required to Be Tried in a Venue Tainted by Substantial and Prejudicial Pretrial Publicity.*

SECOND GROUND FOR RELIEF

> *Mr. Treesh's Custodial Statements Were Obtained in Violation of His Constitutional Rights.  All Statements Obtained in Violation of Miranda Violate the Protections Under the Fifth, Sixth, Eighth, and Fourteenth Amendments.*

THIRD GROUND FOR RELIEF

> *Mr. Treesh Was Denied Due Process and a Fair Trial, and the State Failed to Comply with its Obligations under* Brady v. Maryland *and its Progeny, When the State Lost, and/or Permitted the Destruction of, Material and Exculpatory Evidence Prior to Trial and Before the Defense Could Examine Such Evidence.*

FOURTH GROUND FOR RELIEF

> *The Case Against Petitioner Should Have Been Dismissed Once the Trial Court Learned that the State had Knowingly Permitted the Evidence to be Destroyed.*

FIFTH GROUND FOR RELIEF

> *The Refusal to Allow Treesh Access to the Grand Jury Proceedings in His Case, Where a Secret Indictment Was Obtained and There Were Significant Questions Concerning the State's Improper Use of Statements from an Unconstitutional Custodial Interrogation, Denied Treesh His Rights To Due Process and a Fair Trial.*

SIXTH GROUND FOR RELIEF

> *The Trial Court's Refusal to Provide Treesh with Daily Transcripts of the Trial Proceedings Denied Him Due Process of Law and the Effective Assistance at Counsel.*

14

*SEVENTH GROUND FOR RELIEF*

> *Treesh's Rights to Due Process and a Fair Trial, and to an Impartial Jury, Were Denied When His Reasonable Request for Additional Peremptory Challenges Was Rejected by the Trial Court.*

*EIGHTH GROUND FOR RELIEF*

> *There Was Prosecutorial Misconduct Throughout the Guilt/Innocence Phase of the Trial.*

*NINTH GROUND FOR RELIEF*

> *Treesh Was Denied Due Process and a Fair Trial Before an Impartial Jury Because a Juror (Lynn Volke) Who Expressed Her View That the Death Penalty Is Appropriate in Every Case of Murder Was Permitted to Sit on the Panel over the Defense's Objection for Cause, and Several Other Jurors Were Permitted to Sit Even Though Their Ability to Be Impartial Had Been Tainted by Exposure to Prejudicial Pretrial Publicity.*

*TENTH GROUND FOR RELIEF*

> *The Convictions for Aggravated Murder and Attempted Murder Are Unconstitutional Because They Were Obtained with Insufficient Evidence.*

*ELEVENTH GROUND FOR RELIEF*

> *Treesh Was Denied Due Process and a Fair Trial When the State Improperly Solicited Testimony from its Own Witness about Treesh's Invocation of His Right to Counsel.*

*TWELFTH GROUND FOR RELIEF*

> *The Admission of Cumulative and Gruesome Photos Was Prejudicial and Denied Treesh Due Process and a Fair Trial.*

*THIRTEENTH GROUND FOR RELIEF*

> *Treesh Was Denied Due Process and a Fair Trial When the State Improperly Referenced Treesh's Prior Criminal Record and Other Acts.*

*FOURTEENTH GROUND FOR RELIEF*

15

*Treesh Was Denied the Effective Assistance of Counsel When His Lawyers Failed to Request a Blood Spatter Expert to Confront and Refute the State's Claim That the Victim Was Shot While in a Bent Over Position and to Demonstrate That Treesh and the Victim Were Engaged in a Struggle When the Victim Was Shot.*

## FIFTEENTH GROUND FOR RELIEF

*Treesh Was Denied the Effective Assistance of Counsel in the Guilt/Innocence Phase of His Trial.*

## SIXTEENTH GROUND FOR RELIEF

*Treesh Was Denied the Effective Assistance of Counsel in the Mitigation Phase of His Trial.*

## SEVENTEENTH GROUND FOR RELIEF

*The Allowance of Victim Impact Testimony and of a Plea for the Death Penalty by the Victim's Family Denied Treesh a Fair Trial and a Reliable Sentence.*

## EIGHTEENTH GROUND FOR RELIEF

*The Trial Court's Refusal to Allow an Important Witness to Testify for Treesh during the Mitigation Phase Denied Treesh a Fair Trial and a Reliable Sentencing Determination.*

## NINETEENTH GROUND FOR RELIEF

*The Aggravating Factors Do Not Outweigh the Mitigating Circumstances Beyond a Reasonable Doubt. The Evidence to Support the Death Sentence is Constitutionally Insufficient as a Matter of Law.*

## TWENTIETH GROUND FOR RELIEF

*Treesh Was Denied His Constitutional Rights Because His Lead Trial Attorney Was Also Representing in Another Matter, at the Same Time as Treesh's Case Was Pending, the Lead Detective in Treesh's Case.*

## TWENTY-FIRST GROUND FOR RELIEF

*Requiring Treesh to Choose His Method of Execution Constitutes Cruel and Unusual Punishment.*

16

*TWENTY-SECOND GROUND FOR RELIEF*

> *Treesh Was Denied Discovery and the Assistance of Experts in the Post-Conviction Proceedings, Thereby Denying Him Due Process and Rendering Those Proceedings Inadequate to Protect the Rights of a Death Sentenced Individual.*

*TWENTY-THIRD GROUND FOR RELIEF*

> *Treesh Was Denied a Fair Trial and a Reliable Sentencing Proceeding When the Trial Court Allowed the Jurors to Return to the Community before Commencement of the Sentencing Proceeding, and then Failed to Voir Dire the Jurors about their Exposure to Improper Influences During that Five-Day Break.*

*TWENTY-FOURTH GROUND FOR RELIEF*

*Ohio's Death Penalty Statute Is Unconstitutional in Numerous Respects.*

> a.   *Constitutional Flaws in Trial Proceedings Created by the Ohio Statutory Scheme.*
>
> b.   *Constitutional Flaws in Sentencing Proceedings Created by the Ohio Death Penalty Statute.*
>
> c.   *Constitutional Flaws in Appellate Proceedings Created by the Ohio Death Penalty Statutes.*
>
> d.   *Societal Interests are Not Served by the Ohio Death Penalty Statutes.*
>
> e.   *Imposition of the Death Penalty Demonstrates a Blatant Disregard for the Value of Human Life, Entails Unnecessary and Wanton Infliction of Pain and Diminishes the Dignity of Man.*
>
> f.   *The Ohio Death Penalty Statute Violates the Supremacy Clause of the United States Constitution and Various International Laws Including, But Not Limited to, the Organization of American States Treaty and the American Declaration of the Rights and Duties of Man.*

*TWENTY-FIFTH GROUND FOR RELIEF*

> *The Ohio Death Penalty Scheme Is Unconstitutional as Applied to Treesh.*

*TWENTY-SIXTH GROUND FOR RELIEF*

17

> *Petitioner's Conviction and Sentence Are Unconstitutional Because of the Cumulative Effect of the Many Errors That Occurred During His Trial and in All Subsequent Proceedings.*

*TWENTY-SEVENTH GROUND FOR RELIEF*

> *Treesh is Innocent of the Death Penalty, and it Would Be a Miscarriage of Justice to Allow His Sentence to Remain in Effect.*

## IV. INITIAL CONSIDERATIONS

*A.      Standard of Review: The AEDPA*

A federal court's consideration of a petition for a writ of habeas corpus filed by a prisoner imprisoned under the judgment of a state court is governed by 28 U.S.C. § 2254(a).  Section 2254 permits the state prisoner to challenge his custody "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  *Id.*  Federal habeas corpus relief "does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Thus, "it is not the province of a federal habeas court to re-examine state-court determinations of state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). It is, in short, this court's responsibility to ensure that petitioner received a constitutionally fair trial, not a perfect trial.

The Antiterrorism and Effective Death Penalty Act of 1996, Pub.1.No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), signed into law on April 24, 1996, amended Title 28 of the United States Code and applies to all habeas petitions filed on or after its April 24,1996 effective date. *Barker v. Yukins*, 199 F.3d 867, 871 (6th Cir. 1999) (citations omitted); *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). The AEDPA made significant changes in habeas law, including increasing the restrictions on which issues can be appealed and heightening the respect for state court factual and legal determinations. Because Treesh filed this Petition on June 10, 2002, long after the AEDPA

18

effective date, the AEDPA applies to this Petition. See *Williams v. Coyle*, 167 F.3d 1036, 1040 (6th Cir. 1999).

Under 28 U.S.C. § 2254(d) (enacted as a part of the AEDPA), a petition for writ of habeas corpus:

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

*Id.*; *Staley v. Jones*, 239 F.3d 769, 775 (6th Cir. 2001).

In *Williams v. Taylor*, 529 U.S. 362, 405 (2000), the United States Supreme Court explained that the phrases "contrary to" and "unreasonable application of," found in the first clause of § 2254(d), must be given independent meanings:

> First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

The Supreme Court construed the second clause of § 2254(d) as follows:

> First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.

19

> Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Id.* at 407.

The Court pointed out that, in determining the reasonableness of the state court's decision, the federal court must employ an objective, not subjective, test.[1] When viewing the objective reasonableness of the state court decision, however, a federal court may not find an application to be unreasonable merely because it finds that the state court decision was erroneous or incorrect. *Id.* at 410-12; *Maranian v. Jackson*, 2001 WL 700856, *1 (6th Cir. June 11, 2001).

The *Williams* Court also clarified that "clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." 529 U.S. at 412. The Sixth Circuit later held that this holding "prevents the district court from looking to lower federal court decisions in determining whether the state court decision is contrary to, or an unreasonable application of, clearly established federal law." *Harris v. Stovall,* 212 F. 3d 940, 944 (6th Cir. 2000) (quoting *Herbert,* 160 F.3d at 1135). A habeas court may thus only rely on that class of Supreme

---

[1] With this determination, the Supreme Court rejected the Fourth Circuit's interpretation that a state court's application of federal law was only unreasonable "if the state court has applied federal law in a manner that reasonable jurists would all agree is unreasonable." *Williams*, 529 U.S. at 409.

20

Court precedent that would qualify as an "old rule" under *Teague v. Lane*, 489 U.S. 288 (1989).[2] *Williams*, 529 U.S. at 412.

Under the AEDPA, state determinations of factual issues are presumed to be correct. 28 U.S.C. § 2254(e)(1).  This presumption of correctness is rebuttable only by clear and convincing evidence.  *Harris,* 212 F.3d at 943.

The AEDPA standard of review applies even when there is no state court decision on the merits to evaluate.  *Id.* at 940.  When the state court does not explain its ruling, habeas review is not *de novo* but remains deferential, since this court cannot grant relief unless the state court's result is not in keeping with the AEDPA.  *Id.* at 943.

Put simply, the court may review federal claims that were evaluated on the merits by a state court. Claims that were not so evaluated, either because they were never presented to the state courts (i.e., exhausted) or because they were not properly presented to the state courts (i.e., were procedurally defaulted), are generally not cognizable on federal habeas review.

B.      Exhaustion

The process of presenting a constitutional claim to the state's highest court is called exhaustion. Under the AEDPA, as under the former habeas statute, a prisoner must exhaust his available state court remedies before petitioning for a writ of habeas corpus. 28 U.S.C. §

---

[2]      Under *Teague*, a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final. *Teague,* 489 U.S. at 301. Thus, the rule the petitioner relies upon must be "dictated or compelled" by the cited Supreme Court decision. *Harris*, 212 F.3d at 944.

2254(b)(1)(A). Habeas relief cannot be granted based on claims that have not been exhausted.[3] *Id.*; *see* also *Rose v. Lundy*, 455 U.S. 509 (1982). A state cannot be deemed to have waived the exhaustion requirement unless the state, through counsel, expressly waives it. 28 U.S.C. § 2254(b)(3).

Here, although not expressly waiving the exhaustion requirement, Respondent concedes that Treesh has exhausted all of his habeas claims.

> Respondent observes that all of Treesh's claims are exhausted. The claims are exhausted because they were either raised properly on direct appeal to the Ohio Supreme Court, raised in post-conviction and barred from review on the basis of *res judicata*, or there is no remaining avenue by which Treesh can now fairly present these claims to the state courts.
>
> By pointing out that Treesh's claims have been exhausted because there are no remaining state court remedies, Respondent expressly **does not** waive the exhaustion requirement. 28 U.S.C. § 2254(b)(3); *compare Dennis v. Mitchell*, 68 F. Supp. 2d 863, 879 (N.D. Ohio 1999) (finding Respondent waived exhaustion requirement by stating that claims in petition were exhausted) with Habeas Rule 5 (Respondent's answer shall state whether petitioner has exhausted remedies). Respondent wishes it to be clear that by stating her view that Treesh has exhausted all claims, she **does not** intend to waive the exhaustion requirement.

(ROW 26). The court concludes that the asserted grounds for relief have been exhausted.

### C.    Procedural Default

Federal courts "will not review question[s] of federal law decided by a state court if the decision of that court rests upon a state law ground that is independent of the federal question and adequate to support the judgment."  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  In

---

[3]    An exception exists where the petitioner can show that there is an absence of available state corrective procedures or that circumstances exist that would render such process ineffective to protect the rights of the petitioner. 28 U.S.C. § 2254(b)(1)(B)(i-ii).

*Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), the Supreme Court stated that "the doctrine of procedural default acts to bar federal review of federal claims that a state court has declined to address because of the petitioner's noncompliance with a state procedural requirement."  In such cases, "the state judgment rests on independent and adequate state procedural grounds." *Id.* at 730.

For example, under Ohio law, all claims that were known, or should have been known at the time of trial or direct appeal must be raised on direct appeal from the judgment of conviction. Ohio provides an avenue of relief, namely post-conviction review, for those claims that were unknown, or could not reasonably have been known, to the defendant until after the judgment of conviction. Ohio's post-conviction relief statute, Ohio Rev. Code Ann. § 2953.21(A), provides in pertinent part:

> Any person convicted of a criminal offense or adjudged delinquent claiming that there was such a denial or infringement of his rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States, may file a petition at any time in the court which imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. The petitioner may file such supporting affidavit and other documentary evidence as will support his claim for relief.

This statute has long been interpreted to bar post-conviction consideration of any issue that was or could have been fully litigated before conviction or on direct appeal from that conviction and was not. *See State v. Perry*, 10 Ohio St. 2d 175 (1967), syllabus para. 7; *State v. Combs*, 100 Ohio App. 3d 90 (Ohio App. 1st Dist 1994). The *Perry* court stated:

> Under the doctrine of *res judicata*, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding except an appeal from that judgment any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial, which resulted in that judgment of conviction, or on an appeal from that judgment.

*Perry* at syllabus para. 9.

23

Under *Perry*, *res judicata* has been consistently applied by Ohio state courts to bar consideration of federal claims that were not timely asserted in state court proceedings. *See, e.g., Morales v. Coyle*, 98 F. Supp. 2d 849, 860-61 (N.D. Ohio 2000). Further, this state procedural bar has routinely been observed by federal courts reviewing habeas petitions and is generally deemed an independent and adequate state ground foreclosing federal habeas review. *See, e.g., Byrd v. Collins*, 209 F.3d 486, 521 (6th Cir. 2000).[4]

If the district court concludes that the state prisoner has procedurally defaulted his federal claims in state court, federal review is barred unless the prisoner can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrates that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 749.[5]

---

[4] The Supreme Court of Ohio recognized an exception to the *Perry* rule in *State v. Hester*, 45 Ohio St. 2d 71 (1976). *Hester* concluded that, where the record does not disclose that the issue of competent trial counsel has been adjudicated, res judicata is an improper basis upon which to dismiss an Ohio post-conviction petition. *Id.* at syllabus para. 2. The Ohio Supreme Court subsequently modified the *Hester* exception to the *Perry* rule in *State v. Cole*, 2 Ohio St. 3d 112. 114 (1982), finding that:

> Where the defendant, represented by new counsel upon direct appeal fails to raise therein the issue of competent trial counsel, and said issue could fairly have been determined without resort to evidence outside the record, res judicata is a proper basis for dismissing defendant's petition for post-conviction relief.

*Id.* at syllabus. These modifications to the *Perry* rule have led federal habeas courts to conclude that Ohio's post-conviction statute, upon which *Perry* rests, satisfies due process. *Moralles*, 98 F. Supp. 2d at 861.

[5] The United States Supreme Court reaffirmed this requirement in *Bousley v. United States*, 523 U.S. 614, 622 (1998) (citations omitted):

Demonstrating "cause" requires showing that some factor external to the defense impeded counsel's efforts to comply with the state procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Demonstrating "prejudice" requires showing a disadvantage "infecting" the trial with constitutional error. *United States v. Frady*, 456 U.S. 152, 168 (1982).

Absent cause and prejudice, federal courts may not review issues that are procedurally defaulted unless the petitioner shows that his conviction is the result of a fundamental miscarriage of justice. A fundamental miscarriage of justice is a conviction of one who is "actually innocent." *See Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 496. The Supreme Court requires the petitioner to demonstrate not merely a reasonable doubt in light of new evidence, but rather that "it is more likely than not that no reasonable juror would have convicted [the petitioner] in light of the new evidence." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). The petitioner fails to meet his burden "unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt."[6] *Id*. at 329.

─────────────────────

> Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either "cause" and actual "prejudice," . . . or that he is "actually innocent."

[6] In ascertaining whether a state court has addressed the merits of a petitioner's constitutional claim, federal courts must rely on the presumption that there is no independent and adequate state ground for the state court decision absent a clear statement to the contrary. *Morale*s, 98 F. Supp. 2d at 862 (citing *Coleman*, 501 U.S. at 735). Applying this presumption, the Sixth Circuit has established a four-step analysis to determine whether a claim has in fact been procedurally defaulted. *See Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986). The court must determine (1) whether the petitioner failed to comply with an applicable state procedural rule; (2) whether the state courts actually enforced the state procedural sanction; (3) whether the state procedural bar is an "adequate and independent" state ground on which the State can foreclose federal review; and (4) if the above are met, whether the petitioner has demonstrated cause and prejudice, or a

## V.    GROUNDS FOR RELIEF

### A. Trial Court Error

*1.*[7]    *Treesh Was Denied Due Process and a Fair Trial When His Request for a Change of Venue Was Denied, and He Was Required to Be Tried in a Venue Tainted by Substantial and Prejudicial Pretrial Publicity.*

In this claim, Treesh alleges that substantial pretrial publicity, including publicity of other conduct, arrests, and/or convictions, publication of his confession, eyewitness identification, "sensational" reports of Treesh's multi-state crime spree, and reports that a security guard was killed and law officers were shot at, unconstitutionally tainted his trial.

In cases involving pretrial publicity, "[t]he relevant question is not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton v. Yount,* 467 U.S. 1025, 1035 (1984).  It is sufficient "if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  In *Mu'Min v. Virginia*, 500 U.S. 415, 422 (1991), the Court determined that while a trial court may question potential jurors about their exposure to pre-trial publicity, the court need not inquire about what media coverage each had viewed.  *Id.* at 431.  In upholding the trial court's questioning of the venire, the Court reiterated that "[a] trial court's findings of juror impartiality may be overturned only for 'manifest error.'"  *Id.* at

_____

fundamental miscarriage of justice. *Id.* In determining whether a state court rested its holding on procedural default so as to bar federal habeas review, the court must look to "the last explained state-court judgment."  *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000). *Couch v. Jabe*, 951 F.2d 94, 96 (6th Cir.1991) (quoting *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991)).

[7]    This claim is properly preserved for habeas review; the Respondent does not argue otherwise.

428 (citations omitted).  In this case, each of the potential jurors ultimately seated on Treesh's jury was questioned, and those who recalled reports of the crime and the circumstances of the crime indicated his/her ability to lay that knowledge aside and judge Treesh's case solely on the evidence and law presented before them.  (T. 131-132, 262, 279-280, 378-379. 440-441, 601,795, 820-821, 882, 975.)

As the court determined in *Bell v. Hurley*, 97 F. App'x 11 (6th Cir. 2004), the standard of presuming prejudice from denial of a change of venue only applies in "extraordinary" circumstances.  The court noted that the Supreme Court had not applied a standard of presumed prejudice since *Murphy v. Florida*, 421 U.S. 794, 798 (1975).  Indeed, in *Hurley*, voluminous newspaper reports were insufficient to create a presumption of prejudice requiring reversal of an order denying a change of venue based on pretrial publicity.

Furthermore, Treesh cannot substantiate a claim that prejudice should be presumed in this case. The United States Supreme Court determined that in cases where a media-run "carnival atmosphere" supplants the solemnity and dignity of a courtroom proceeding, a defendant may presume that the media attention so prejudiced his proceeding as to deny him or her due process of the law.  *Sheppard v. Maxwell*, 384 U.S. 333, 355 (1966).  In *Sheppard,* the entire pretrial period was pervaded with harmful incriminating publicity. The news media frequently aired charges and countercharges besides those for which Sheppard was charged.  Three months before trial, a televised inquest was held before an audience of several hundred spectators in a gymnasium, during which Sheppard was examined for more than five hours without counsel.  About three weeks before trial, the newspapers published the names and addresses of prospective jurors, causing them to receive telephone calls and letters about the case.  An election took place during the trial in which

the prosecutor and the trial judge were candidates for judgeships. The media  was allowed to take over almost the entire courtroom, disturbing Sheppard and most of the participants. Members of the press were seated so close to Sheppard that privacy between him and his counsel was precluded. The movement of the reporters in the courtroom caused frequent confusion and disrupted the trial. The jurors were not sequestered before beginning deliberations and had access to all news media. Although they were sequestered during deliberations, the jurors were allowed to make inadequately supervised telephone calls. Despite his awareness of the situation, the judge did nothing to prevent it.

A review of the media attention this case received does not suggest that it inherently prejudiced Treesh's trial.  Treesh does not allege that the flurry of media present in the *Sheppard* courtroom was present during his trial.  Individual jury *voir dire* was extensive in this case and resulted in the seating of jurors who assured the court and the parties that they could impartially judge the case based on the evidence at trial and the judge's instructions. As a result, Treesh's claims of jury bias and improper denial of a change of venue do not warrant habeas relief.

5.[8]     *The Refusal to Allow Treesh Access to the Grand Jury Proceedings in His Case, Where a  Secret Indictment  Was Obtained and There Were Significant Questions Concerning the State's Improper Use of Statements from an Unconstitutional Custodial Interrogation, Denied Treesh His Rights To Due Process and a Fair Trial.*

In this claim, Treesh argues that his rights were violated when the court failed to provide him with a record of his grand jury proceedings. In particular, Treesh argues that the secrecy of grand jury proceedings unconstitutionally prejudiced him (Pet. 22) and that his indictment was based in

---

[8]     This claim is properly preserved for habeas review; the Respondent does not argue otherwise.

large part on the testimony of Det. Thomas Doyle and "perhaps other police officers, thereby denying Treesh a meaningful opportunity to support his claim that the police conducted an unconstitutional custodial interrogation and were knowingly using the fruits of that interrogation to secure a 'secret' indictment and otherwise unfairly advocate for [Treesh's] execution." *Id.*

To the extent this is a claimed error of state law, this court cannot rule on it. *Estelle*, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.")  In *State v. Greer*, 66 Ohio St. 2d 139, 148 (1981), the Ohio Supreme Court stated that "Ohio has not, by case law, adopted the rule embodied within the Jencks Act to the effect that grand jury proceedings must be made available to a defendant upon discovery proceedings." *See also White v. Singletary*, 70 F.3d 1198, 1201 (11th Cir. 1995).

On this issue, the Ohio Supreme Court ruled as follows:

> Treesh asserts that the trial court erred when it denied him access to the record of grand jury proceedings. We disagree.  This Court has recognized a limited exception to the general rule in favor of grand jury secrecy, holding that an accused is not entitled to review the transcript of grand jury proceedings "unless the ends of justice require it and there is a showing by the defense that a *particularized need* for disclosure exists which outweighs the need for secrecy."  (Emphasis added.) *State v. Greer* (1981), 66 Ohio St. 2d 139,  20 Ohio Op. 3d 157, 420 N.E.2d 982, paragraph two of the syllabus. "Whether particularized need for disclosure of grand jury testimony is shown is a question of fact; but, generally, it is shown where from a consideration of all the surrounding circumstances it is probable that the failure to disclose the testimony will deprive the defendant of a fair adjudication of the allegations placed in issue by the witness' trial testimony." *Id.*, paragraph three of the syllabus. *See, also, State v. Sellards* (1985), 17 Ohio St. 3d 169, 173, 17 Ohio B. Rep. 410, 413, 478 N.E.2d 781, 785.   This is a matter within the trial court's discretion. *Greer, supra*, 66 Ohio St. 2d at 148, 20 Ohio Op. 3d at 163, 420 N.E.2d at 988.  In *Sellards, supra,* the accused demonstrated a particularized need to inspect relevant portions of grand jury testimony because inspection was necessary to prove the accused's claim that the prosecution intentionally withheld specific material information from the defense – a claim itself borne out by trial testimony. *Sellards*, 17 Ohio St. 3d at 173, 17 Ohio B. Rep. at 413, 478 N.E.2d at 785-786.

>Attempting to articulate a particularized need here, Treesh asserts that "all information therein [was] needed to properly and fully prepare his defense. * * * The Appellant, in a capital murder matter, should have been permitted copies of the grand jury transcript to allow him to best fully prepare his defense."  Treesh thus implies that the severity of the potential penalty, without more, results in a particularized need for the grand jury transcripts. We disagree.  Though *Greer* itself was not a death-penalty case, this court has applied *Greer* to capital cases, and rejected assertions of particularized need when appellants failed to meet their burden to specify that need or demonstrate how nondisclosure deprived them of a fair trial.  *See, e.g.*, *State v. Benge* (1996), 75 Ohio St. 3d 136, 145, 661 N.E.2d 1019, 1028; *State v. Lawson* (1992), 64 Ohio St. 3d 336, 345, 595 N.E.2d 902, 909- 910.

>In his original motion for a transcript of grand jury proceedings, Treesh was more specific than in his brief to this Court, asserting that he required the grand jury testimony of Benjamin Brooks.  But as the court of appeals noted, Brooks never testified at trial, and Treesh has failed to establish that he had a particularized need for the disclosure of the grand jury record.  The trial court did not abuse its discretion when it overruled Treesh's motion for a transcript of grand jury proceedings.

*State v. Treesh*, 90 Ohio St. 3d 460, 476-78 (Ohio 2001).

Generally, an accused is not entitled to see grand jury transcripts unless required by the ends of justice and he shows that a particular need for disclosure exists that outweighs the need for secrecy.  *United States v. Proctor and Gamble*, 356 U.S. 677, 682 (1958); *Garret v. Moore*, 2007 WL 315093, *10 (S.D. Ohio Jan. 30, 2007); *Blalock v. Wilson*, 2006 WL 1866666 (N.D. Ohio June 30, 2006); *United States v. Tennyson*, 88 F.R.D. 119, 121 (E.D. Tenn. 1980).  Grand jury material may be disclosed where it appears that failure to do so will deny the defendant a fair trial.  *Blalock*, 2006 WL 1866666; *State v. Sellards,* 17 Ohio St. 3d 169, 173 (1985).  The particularized need requirement is not satisfied by a generalized request to inspect grand jury testimony.  *Tennyson*, 88 F.R.D. at 121.

To the extent that Treesh was seeking to assert a due process claim for failure to provide a transcript that would allow him to fully prepare his defense, the court finds that his claim should

be denied.  He also argues that he needed grand jury testimony to attack his indictment.  (Pet. 22.)

This argument lacks merit as well.  As the Supreme Court stated in *United States v. Calandra*, 414

U.S. 338, 344-345 (1974), "[t]he grand jury's sources of information are widely drawn, and the

validity of an indictment is not affected by the character of the evidence considered.  Thus, an

indictment valid on its face is not subject to challenge on the ground that the grand jury acted on

the basis of inadequate or incompetent evidence . . . ."  The court therefore denies this claim.

> 6.[9]    *The Trial Court's Refusal to Provide Treesh with Daily Transcripts of the Trial Proceedings Denied Him Due Process of Law and the Effective Assistance of Counsel.*

The Ohio Supreme Court ruled regarding the above claim as follows:

> Treesh contends that as a death-penalty defendant, he was "entitled by law" to have daily transcripts of all proceedings provided to him. Treesh filed a pretrial motion for daily transcripts.   In its response, the state recognized that Treesh would be entitled to a transcript for purposes of appeal, but urged the court to deny Treesh's request for daily transcripts in favor of a "wait and see" approach.   The trial court denied Treesh's motion for daily transcripts in a journal entry disposing of several other pretrial matters. In his brief to this Court, Treesh asserts that due to his need for thorough and ongoing investigation and trial preparation, his need for an adequate defense, the seriousness of the offense, the severity of his potential punishment, and his constitutional right to confrontation, the trial court improperly overruled his motion for daily transcripts.   We disagree.

> The United States Supreme Court has held that "the State must, as a matter of equal protection, provide indigent prisoners with the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners.  While the outer limits of that principle are not clear, there can be no doubt that the State must provide an indigent defendant with a transcript of prior proceedings when that transcript is needed for an effective defense or appeal." *Britt v. North Carolina* (1971), 404 U.S. 226,

---

[9]    This claim is properly preserved for habeas review; the Respondent does not argue otherwise.

31

227), . . . . We explicitly followed *Britt* in *State v. Arrington* (1975), 42 Ohio St. 2d 114, 71 O.O.2d 81, . . paragraph one of the syllabus.

Though appellant relies on *Britt* to support his alleged entitlement to daily transcripts, *Britt* simply does not require that a capital defendant be provided with transcripts of each day's testimony as trial proceeds. *United States v. Sliker* (C.A.2, 1984), 751 F.2d 477, 491 (holding that even in light of *Britt,* denial of defendant's request for daily transcripts was not an abuse of discretion or denial of defendant's constitutional rights). "Common experience informs us that it is entirely practicable to present an effective defense in a criminal case without daily copy, however convenient daily copy undoubtedly is." *Id. See, also*, *United States v. Rucker* (C.A.2, 1978), 586 F.2d 899, 905 (finding no constitutional deprivation due to denial of daily transcripts). The Constitution does not require that indigent defendants be furnished with every possible legal tool, "no matter how speculative its value, and no matter how devoid of assistance it may be, merely because a person of unlimited means might choose to waste his resources." *United States v. MacCollom* (1976), 426 U.S. 317. . . (Blackmun, J., concurring).

Assuming, *arguendo,* that the trial court erred by denying Treesh's motion for daily transcripts, Treesh has failed to articulate any specific prejudice resulting from a lack of access to such transcripts, and we discern none. Accord *Thomason v. State* (1997), 268 Ga. 298, 312, 486 S.E.2d 861, 873. Treesh apparently seeks a *per se* rule requiring the provision of daily transcripts to all capital defendants, but we decline to extend *Britt* beyond the factual circumstances recognized by the Supreme Court. *Cf. Harris v. Stovall* (C.A.6, 2000), 212 F.3d 940, 945 (rejecting defendant's contention that *Britt* entitled him to transcripts from his accomplice's trial).

*Treesh*, 90 Ohio St. 3d at 477-80.

Treesh had no "right" to a daily transcript of his trial proceedings. Citing *Draper v. Washington*, 372 U.S. 487, 495-96 (1963), the United States Supreme Court has held that "[t]o be sure, a transcript of [a] prior [habeas corpus] hearing may be an incidental convenience – so, too, would a daily transcript at a criminal trial – but the Fourteenth Amendment does not require a State to furnish an indigent with every luxury that a wealthy litigant might conceivably choose to purchase." *Gardner v. California*, 393 U.S. 367 (1969). Treesh argues only that his need for a

32

thorough and ongoing investigation and trial preparation, adequate defense, the seriousness of the offense, the severity of his potential punishment, and his constitutional right to confrontation, justify his need for daily transcripts. Treesh and his attorneys were present each day of his trial and could rely on their notes and collective recollection of the events of those days to provide substance for an ongoing investigation, trial preparation, and defense. In short, Treesh has not shown that his case was so complicated or extended that his lawyers were required to submit briefs or proposed findings that might justify a need for daily transcripts. This claim of error is therefore denied.

> 7.[10]  *Treesh's Rights to Due Process and a Fair Trial, and to an Impartial Jury, Were Denied When His Request for Additional Peremptory Challenges Was Rejected by the Trial Court.*

In this claim, Treesh argues that the trial judge denied, to his detriment, his request for additional peremptory challenges. In particular, Treesh argues that by limiting his peremptory challenges to six, the trial court violated his state court rights under Ohio Rule of Criminal Procedure 24(C) and Ohio Rev. Code Ann. § 2945.21(A)(2) and his federal due process rights. This court disagrees.

Ohio Criminal Rule 24(C) limits peremptory challenges to six in non-capital cases; Ohio statutory law limits capital peremptory challenges to twelve. Ohio Rev. Code Ann. § 2945.21(A)(2). To the extent that this claim asserts a violation of state law, the claim is not cognizable on habeas corpus review. *Lewis*, 497 U.S. at 780; *Baze v. Parker*, 371 F.3d 310, 322 (6th Cir. 2004), *cert. denied*, 125 S. Ct. 1670 (2005). Federal law does not mandate a certain minimum number of peremptory challenges even in death penalty cases. The number of peremptory challenges in a

---

[10]  This claim is properly preserved for habeas review; the Respondent does not argue otherwise.

death penalty case is left to the discretion of the state. *Ross v. Oklahoma*, 487 U.S. 81, 89 (1988);

*Baze*, 371 F.3d at 322-23.

The Ohio Supreme Court summarily denied Treesh's claim on direct appeal:

> We summarily reject appellant's sixth proposition of law (number of peremptory challenges) on the authority of *State v. Mills* (1992), 62 Ohio St. 3d 357, 365, 582 N.E.2d 972, 981;  *See* also, *State v. Greer* (1988), 39 Ohio St. 3d 236, 530 N.E.2d 382, paragraph two of the syllabus.

*Treesh*, 90 Ohio St. 3d at 463. In this case, Treesh has neither shown that he had a right to more

peremptory challenges, nor that the jury selected was improperly biased as a whole.

Moreover, the court record reveals that despite the court initially imposing a limit of six

peremptory challenges, it allowed Treesh eight peremptory challenges (those of Jurors Bonney,

Hutson, Erkkila, and those of Jurors 37, 7, 8, 46, and 70) and did not order Treesh to stop making

peremptory challenges after those jurors were dismissed.

Finally, the test employed in exercising peremptory challenges is that of overall bias of the

jury.  As Treesh does not suggest that the jury as a whole was impermissibly biased against him,

his claim of bias does not rise to a constitutional level.  The court therefore denies this claim for

relief.

> *9.[11]*   *Treesh Was Denied Due Process, and a Fair Trial Before an Impartial Jury, Because a Juror (Lynn Volke) Who Expressed Her View That the Death Penalty Is Appropriate in  Every Case  of Murder Was Permitted to Sit on the Panel over the Defense's Objection for Cause, and Several Other Jurors Were Permitted to Sit Even Though Their Ability to Be Impartial Had Been Tainted By Exposure to Prejudicial Pretrial Publicity.*

---

[11]   This claim is properly preserved for habeas review; the Respondent does not argue otherwise.

34

In *Morgan v. Illinois*, 504 U.S. 719, 738 (1992), the Court reviewed a so-called "reverse *Witherspoon*"[12] case and concluded that "[a]ny juror who states that he or she will automatically vote for the death penalty without regard to the mitigating evidence is announcing an intention not to follow the instructions to consider the mitigating evidence and to decide if it is sufficient to preclude imposition of the death penalty."   Thus, the Court instructed trial courts that, regardless of a juror's personal beliefs, the juror must be able to follow the law to ensure a defendant's right to a fair trial.

During *voir dire*, the following conversation occurred:

|  |  |
|---|---|
| THE COURT: | What is your opinion concerning the death penalty? |
| MS. VOLKE: | I believe in it. |
| THE COURT: | Okay.  Let me ask you this, do you feel you would be able to follow the Court's instructions and fairly consider the death penalty when called upon to do so in this case with the following additional instructions?  When considering this question you should understand that as a juror, you will deliberate two times.  You will deliberate first to determine whether or not the Defendant is guilty as charged, as you understand he is innocent until proven guilty. You will deliberate first – I am sorry – if you find the Defendant guilty of the aggravated murder, you will then deliberate to determine which sentence you will recommend. |

---

[12]    In *Witherspoon v. Illinois,* 391 U.S. 510, 521-22 (1968), the Supreme Court invalidated a capital sentence when the trial court excused all jurors who expressed a conscientious objection to the death penalty.  The Court reasoned that the proper inquiry was not whether a prospective juror opposed the death penalty generally, but whether the juror's religious, moral or philosophical beliefs would prevent him or her from following the court's instructions.  *Id.* at 514 n.7 ("[E]ven a juror who believes that capital punishment should never be inflicted and who is irrevocably committed to its abolition could nonetheless subordinate his personal views to what he perceived to be his duty to abide by his oath as a juror and to obey the laws of the State.").

35

|  | Upon a finding of guilty you can recommend three sentences: you can recommend the death penalty, life imprisonment with parole eligibility after serving 30 full years, life imprisonment with parole eligibility after serving 20 full years. |
|--|--|
|  | Or stated another way, can you consider all the evidence, arguments, and other relevant information and evidence concerning the aggravating circumstances of the offenses, together with the mitigating factors in this case as to history, character, and background of the Defendant, along with the instructions that I will give you and fairly consider the death penalty if appropriate? |
| MS. VOLKE: | Yes, I think I can. |
| MR. CULOTTA: | You stated you believe in the death penalty, what types of cases would you feel that the death penalty should be used for? |
| MS. VOLKE: | You know, murder cases in general.  I don't know really what the different types are, so it would be hard for me to understand. |
| MR. CULOTTA: | The Judge will explain that when it's appropriate in this case.  You understand that the State of Ohio is seeking the death penalty, does that offend you in any way that's what we are seeking? |
| MS. VOLKE: | No, not at all. |
| MR. CULOTTA: | The Judge explained for you briefly there is two separate phases in this case.  The first phase is to determine whether he is guilty or not of the charges. The ultimate sentenced [sic] that is to be imposed has no bearing on this, do you understand? |
| MS. VOLKE: | Yes. |
| MR. CULOTTA: | You can separate the two? |
| MS. VOLKE: | Definitely. |
| MR. CULOTTA: | The second phase we will argue and present evidence of aggravating circumstances and they may also want to present evidence of factors of mitigation for the sentence to lessen death.  Will you be able to fairly consider those factors, weigh them, give each a fair finding, and after you have considered that you feel |

36

|  | that the death penalty should be imposed you will be able to do that? |
|---|---|
| MS. VOLKE: | Yes. |
| MR. CULOTTA: | Likewise, if you find, when listening to the Judge's instructions, some other lesser sentence should be imposed you will be able to consider that also? |
| MS. VOLKE: | Yes. |
| MR. CULOTTA: | You wouldn't automatically vote one way or the other for the death penalty in this case? |
| MS. VOLKE: | I'd want to hear everything that there was, hear the Judge's instructions, you know, follow accordingly. |
| MR. CULOTTA: | You'd follow those instructions and apply those to the facts as you find them here? |
| MS. VOLKE: | Yes, I wouldn't make a snap decision. |
| MR. CULOTTA: | That's – you're not supposed to, that's exactly the way you're supposed to do it. |
| . . . | |
| MR. RITTS: | You indicated to everyone, the Judge, Mr. Culotta, you believe in the death penalty, can you tell me why? |
| MS. VOLKE: | I think if someone takes another person's life they should give their life up. |
| MR. RITTS: | And would that be – do you believe that would be in every case or in some cases? |
| MS. VOLKE: | No, in every case. |
| MR. RITTS: | Where someone takes a life they should pay with their life? |
| MS. VOLKE: | Right. |
| MR. RITTS: | Would there be anything where a life is purposely taken that would sway you not to execute? |
| MS. VOLKE: | No. |
| MR. RITTS: | Someone -- |
| MS. VOLKE: | No. |
| MR. HAWKINS: | May we approach, Your Honor? |
| MR. CULOTTA: | Judge, can I inquire? |
| MR. RITTS: | Can I finish? |

37

Now, this is not meant to be directed toward you.  First let me tell you we appreciate your candor and honesty. It's very important in considering that we find out who can follow the law and who cannot, especially in a situation as grave as this is.  Now, this is not a theft case.  We're asking your position on the death penalty and we can't excuse you for that. . . . but it's very important and significant in this case, and it's important that we get a fair cross section.

And I want to finish up and ask you in this situation there are allegations, and if you get to consider penalty it will be proven, that Frederick Treesh purposely killed another man during the commission of a robbery, that he was the principal offender, meaning that he was the gun man, and also that it may have been done to prohibit or protect him, aid in escape and avoiding apprehension, trial, detection, or punishment.

Now, if that's proven and you're sitting here and you're going to decide whether or not to sentence Fred to death in a case where he purposely took the life of another, is there any situation where you would not consider the alternative terms of 20 years to life or 30 years to life?

MS. VOLKE:        No.

MR. RITTS:        Thank you.

. . .

MR. CULOTTA:      I asked you before if you'd automatically vote one way or the other regarding the death penalty and you said no, you'd listen to everything?

MS. VOLKE:        Uh-huh.

MR. CULOTTA:      In this case in the second phase the Judge is going to give you instructions as to what you should consider in determining whether you should impose death or something less than death.  What is going to happen in the second phase is they may choose to present some mitigating factors, or something in their mind that they think a lesser penalty of death should be imposed.  The Judge is going to tell you that you have to consider these mitigating factors to make a determination, would you be able to consider these mitigating factors?

MS. VOLKE:        Yes.

38

| | |
|---|---|
| MR. CULOTTA: | When the Judge instructs you on the law, when determining whether or not the death penalty should be imposed . . . he will tell you that you have to weigh these mitigating factors against the aggravating factors of the crime; do you understand that? |
| MS. VOLKE: | Uh-huh. |
| MR. CULOTTA: | If you find those aggravating factors of that crime don't outweigh the mitigating factors, the Judge is going to instruct you that you have to return a sentence of – a verdict of 20 years to life or 30 years to life; do you follow me  here? |
| MS. VOLKE: | Yes. |
| MR. CULOTTA: | Could you follow the Judge's instructions on this in the mitigation phase – sentencing phase and if you find that the mitigating factors aren't outweighed by aggravating factors – you find they present evidence which could establish, as the Judge is going to tell you, death is not an appropriate sentence, you can't impose the death sentence, can you follow the Judge's instructions? |
| MS. VOLKE: | Yes. |
| MR. CULOTTA: | So, just because the State is now in the second phase here where we have proven he committed this purposeful killing of another during a robbery, Mr. Ritts was asking you questions, you said in that situation it'd automatically be the death penalty? |
| MS. VOLKE: | I think I was confused. |
| MR. CULOTTA: | You were confused about the -- |
| MS. VOLKE: | About the – the different phases. I thought you were speaking of one phase, I guess it's just confusing. |
| MR. CULOTTA: | We are totally.  At the second phase he's been found guilty, at this point we have another mini trial, new witnesses are going [sic] come here to testify -- |
| MS. VOLKE: | In that case, yeah, I would be able to consider the circumstances and follow the Judge's instructions, I wouldn't automatically say -- |
| MR. CULOTTA: | Just because you know at that point he's guilty of purposely killing somebody -- |
| MS. VOLKE: | Right, I was confused what he was asking me. |

| | |
|---|---|
| MR. CULOTTA: | At this point you will consider evidence and if you found that the aggravating circumstances did not outweigh the mitigating factors, you will be able to impose a lesser sentence. |
| MS. VOLKE: | Yes. |
| MR. CULOTTA: | And follow the Judge's instructions? |
| MS. VOLKE: | Yes, I think I was confused. |
| MR. CULOTTA: | There are two separate trials here.  Those mitigate [sic] factors – your decision as to the death penalty has nothing to do with the first phase where you found guilt.  You're going to find him not guilty, it's over, we don't go into the second phase. |
| | If you find him guilty we are going to have another little trial, more witnesses will come it [sic], after it's over you go and deliberate again, the Judge will instruct you and you will follow the law in that regard. |
| MS. VOLKE: | Oh, yeah. |
| MR. CULOTTA: | Could you follow the Judge's instructions? |
| MS. VOLKE: | Yes. |
| MR. CULOTTA: | If circumstances dictate the death penalty is not appropriate - |
| MS. VOLKE: | Then I could go the other way. |
| MR. CULOTTA: | You could go the other way? |
| MS. VOLKE: | Yes. |

(T. 441-453).

The Ohio Supreme Court addressed the seating of Juror Volke as follows:

> Treesh contends that the inclusion of Juror Lynn Volke denied him his constitutional right to a fair and impartial jury due to Volke's "unbending position" in support of the death penalty. For the following reasons, we disagree. R.C. 2945.25(C) provides that a prospective juror in a capital punishment case may be challenged for cause where "he unequivocally states that under no circumstances will he follow the instructions of a trial judge and consider fairly the imposition of a sentence of death in a particular case.  A prospective juror's conscientious or religious opposition to the death penalty in and of itself is not grounds for a challenge for cause.  All parties shall be given wide latitude in voir dire questioning in this regard."

40

We have held that "'[a] juror who will automatically vote for the death penalty *in every case* will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. * * * [A] capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." (Emphasis added). *State v. Williams* (1997), 79 Ohio St. 3d 1, 6, 679 N.E.2d 646, 653, quoting *Morgan v. Illinois* (1992), 504 U.S. 719, 729, 112 S. Ct. 2222, 2229-2230, 119 L.Ed.2d 492, 502-503. This court has also noted, however, that even if a juror shows a *predisposition* in favor of imposing the death penalty, the trial court does not abuse its discretion in overruling a challenge for cause if the juror later states that she will follow the law and the court's instructions. *State v. Mack* (1995), 73 Ohio St. 3d 502, 510, 653 N.E.2d 329, 336.

Juror Volke did initially reveal a predisposition in favor of the death penalty. When the court questioned Volke regarding her opinion of the death penalty, Volke said, "I believe in it." When the assistant prosecutor asked Volke if the state's decision to seek the death penalty offended her in any way, Volke replied, "No, not at all." Defense counsel then asked Volke why she believed in the death penalty, and Volke responded, "I think if someone takes another person's life they should give their life up." When defense counsel continued, "And would that be--do you believe that would be in every case or in some cases?" Volke replied, "*No, in every case.*" (Emphasis added.)

If the voir dire of juror Volke had simply ended here, we assume, without deciding, that her inclusion in the jury panel would have violated R.C. 2945.25(C) and this court's decision in *Williams, supra,* 79 Ohio St. 3d 1, 679 N.E.2d 646. Our *Williams* decision, after all, precludes the state from executing an offender when one of the empaneled jurors would "automatically vote for the death penalty *in every case.*" (Emphasis added.) *Id.* at 6, 679 N.E.2d at 653. But as voir dire continued, Volke stated that she had been confused by earlier questions and insisted that she would follow the law and the court's instructions. After being asked several searching follow-up questions by the court, the assistant prosecutor, and defense counsel, juror Volke specifically indicated on more than one occasion that she could consider mitigating circumstances and impose a lesser sentence under appropriate circumstances. Juror Volke's inclusion in the jury, therefore, did not violate *Williams* and was consistent with this court's decision in *State v. Mack*, *supra.* Accordingly, we overrule appellant's eighth proposition of law.

*Treesh*, 90 Ohio St. 3d at 468-69.

41

The court agrees with the trial court's analysis and therefore denies this claim for relief. This determination is consistent with the court's holding in *Morgan*, which requires that a juror be removed for cause in circumstances where that juror indicates that he will automatically vote for the death penalty in every case. In this case, Juror Volke, while initially expressing an unqualified opinion that anyone who takes a life should lose his life, later expressed that she had misunderstood the questions put to her and the process followed in death penalty cases and agreed that she could follow the judge's instructions and consider a penalty less than death if the circumstances of Treesh's case warranted a lesser penalty. Thus, this claim is without merit.

12.[13]    *The Admission of Cumulative and Gruesome Photos Was Prejudicial and Denied Treesh Due Process and a Fair Trial.*

In this claim, Treesh argues that the trial court improperly admitted cumulative, gruesome photographs. In particular, Treesh argues that the following photos were improperly admitted into evidence:

Exh.  32(a)  Picture of victim's head;

Exh.  32(b)  Picture of victim's upper torso with bullet holes;

Exh.  32(c)  Picture of victim's chest with bullet holes;

Exh.  32(d)  Picture of victim with gunshot residue;

Exh.  32(e)  Picture of victim's back;

Exh.  32(f)  Picture of victim's knees;

Exh.  32(g)  Picture of victim's legs.

To the extent that this is a challenge to the technical correctness of these evidentiary rulings, this court lacks authority to consider the challenge. *Estelle*, 502 U.S. at 67-68; *Coleman v. Mitchell*,

---

[13]    This claim is properly preserved for habeas review; the Respondent does not argue otherwise.

244 F.3d 533, 542 (6th Cir. 2001) ("A state court evidentiary ruling will be reviewed by a federal habeas court only if it were so fundamentally unfair as to violate the petitioner's due process rights.").

Moreover, review of the pictures Treesh complains of shows they were neither unduly gruesome or duplicative, but presented a fair representation of Dupree's dead body.  The photographs were introduced to illustrate the coroner's testimony, to present different perspectives of the victim, and to illustrate the nature of the encounter that immediately preceded Dupree's death.  *See State v. Frazier*, 73 Ohio St. 3d 323 (1995).  Under these circumstances, the photographs' probative value substantially outweighed the danger of unfair prejudice to Treesh.  *Id.*  The court therefore concludes that admission of the seven photographs of Dupree was not an unreasonable application of federal law as articulated by the Supreme Court. *See Willingham v. Mullin*, 296 F.3d 917, 928-29 (10th Cir. 2002), *cert. denied*, 538 U.S. 1036 (2003) (denying relief on a habeas petitioner's claim that the admission of the 22 photos of the victim's body was so unduly prejudicial as to render his trial fundamentally unfair). The court therefore denies this claim for relief.

> 13.[14]   *Treesh was Denied Due Process and a Fair Trial When the State Improperly Referenced Treesh's Prior Criminal Record and Other Acts.*

In this claim, Treesh sought to exclude reference to other crimes and acts and sought a mistrial upon admission of those prior acts.  The court denied both motions.  Treesh argues that the court's failure to exclude reference to those prior acts and crimes violated his constitutional rights.  The court finds that the decision of the Ohio Supreme Court, confirming the trial court's ruling, was

---

[14]      This claim is properly preserved for habeas review; the Respondent does not argue otherwise.

not contrary to, or an unreasonable application of, established federal law as determined by the United States Supreme Court.

Treesh contends that the trial court should have declared a mistrial after the prosecutor "tried to introduce evidence of prior acts of Appellant."  Treesh's proposition is based on the following exchange:

> [Prosecutor:]  And when you asked the Eastlake police if you were charged with murder one, you knew what it meant?
>
> [Treesh:]  I thought it was the highest degree.
>
> [Prosecutor:]  Well, now, you knew about the different levels of murder one, of murder, didn't you?
>
> [Treesh:]  Are you telling me what I know?
>
> [Prosecutor:]  No, I am asking, didn't you know?
>
> [Treesh:]  No, I didn't.
>
> [Prosecutor:]  Well, you testified on direct that you had previous convictions?
>
> [Treesh:]  Yes sir, I did.

Defense counsel objected.  The trial court sustained the objection, and ordered the prosecutor to abandon this line of questioning.  Shortly thereafter, the trial court overruled Treesh's motion for mistrial.

In his brief, Treesh contends that "[i]t is unequivocally clear that the prosecutor was attempting to prove, through prior convictions, the character of the appellant in order to show that he acted in conformity therewith in violation of Rule 404(B) of the Ohio Rules of Evidence." This rule provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the

44

character of a person in order to show that he acted in conformity therewith."  *See also State v. Woodard*, 68 Ohio St. 3d 70, 73 (1993) (citing *State v. Wickline*, 50 Ohio St. 3d 114, 120 (1990)).[15]

The Ohio Supreme Court ruled that there was no reversible error in the prosecutor's reference to Treesh's prior convictions on cross-examination because the prosecutor simply sought confirmation of those convictions that Treesh admitted on direct examination, because the trial court properly sustained an objection, and because the reference did not deprive Treesh of a fair trial.

The Ohio Supreme Court stated:

> Here, because the trial court immediately sustained defense counsel's objection and prohibited the prosecutor from pursuing this line of inquiry, the trial court did not err in overruling Treesh's motion for a mistrial.  As we noted above, the granting or denial of a motion for mistrial rests in the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion.  *State v. Garner* (1995), 74 Ohio St. 3d 49, 59, 656 N.E.2d 623, 634.  On direct examination, Treesh had already admitted to prior convictions for the felonies of receiving stolen property, forgery, and burglary.  The prosecutor's question on cross-examination merely asked Treesh to confirm that prior testimony.  Since the trial court sustained the objection to this question, no further bad acts testimony was admitted, avoiding any potential violation of Evid.R. 404(B).
>
> Treesh cites our *Lytle* decision for the proposition that the improper use of other-acts evidence necessitates reversal when there is a "reasonable possibility that the testimony contributed to the accused's conviction." *State v. Lytle* (1976), 48 Ohio St. 2d 391, 2 O.O.3d 495, 358 N.E.2d 623, paragraph three of the syllabus.  Upon consideration of the record as a whole, "we believe it most unlikely that the 'other act' testimony contributed in any noticeable degree" to Treesh's convictions. *Id.,* 48 Ohio St. 2d at 403, 2 O.O.3d at 502, 358 N.E.2d at 631.

*Treesh*, 90 Ohio St. 3d at 482.

---

[15]    Treesh later argued that evidence of his past crimes and bad acts should have been admitted to prove that he had not killed his former victims.

This court agrees with the Ohio Supreme Court's analysis, finding that it is neither contrary to nor an unreasonable application of clearly-established federal law.  *See, e.g.*, *Lovett v. Foltz*, 1989 WL 101522 *7 (6th Cir. Sept. 5, 1989) (citing *United States v. Beros*, 833 F.2d 455, 463-64 (3d Cir.1987)).  The court therefore denies Treesh's claim of error.

> 17.[16]    *The Allowance of Victim Impact Testimony, and of a Plea for the Death Penalty by the Victim's Family, Denied Treesh a Fair Trial and a Reliable Sentence.*

Citing *Payne v. Tennessee*, 501 U.S. 808, 827 (1991), the Sixth Circuit has held that there is no *per se* bar to the introduction of victim impact evidence and argument during the penalty phase of the trial.  *Byrd*, 209 F.3d at 532.  Rather, the due process clause protects against victim impact evidence that is so unduly prejudicial it renders the trial fundamentally unfair. *Id*. (citing *Payne*, 501 U.S. at 825); *see also Roe v. Baker*, 316 F.3d 557, 565-66 (6th Cir. 2002), *cert. denied*, 540 U.S. 853 (2003).

Ohio permits, with some limitations, victim impact testimony during capital sentencing proceedings. *See, e.g.*, *State v. Hartman*, 93 Ohio St. 3d 274, 292 (2001) (victim impact testimony permitted in capital cases where the testimony is not overemotional or directed to the penalty to be imposed); *State v. Fautenberry*, 72 Ohio St. 3d 435, 439-40 (1995) (holding that while true victim impact evidence is considered by the trial court prior to imposing sentence, evidence relating to the facts surrounding the offense is clearly admissible during the guilt phase; as a result, evidence which depicts both the circumstances surrounding the commission of the murder and the impact on the

---

[16]    This claim is properly preserved for habeas review; the Respondent does not argue otherwise.

46

victim's family may be admissible during both the guilt and the sentencing phases). Nevertheless, Ohio has specifically held that expressions of opinion relating to the appropriate sentence to be imposed upon the defendant remain improper even after *Payne*. *Fautenberry*, 72 Ohio St. 3d at 439 (holding that the three-judge panel's decision fails to demonstrate that the judges contemplated or relied upon the victim impact evidence available to them).

In this case, one piece of victim impact testimony was presented solely to the judge after the jury had made its recommendation and been excused. The testimony included a statement by Dupree's daughter (Luckason) that "[her family] strongly support an 'Eye for an Eye.' Mr. Treesh has no remorse when he brutally . . . murdered Henry, who was caught off guard. We are asking that the death penalty be given to Mr. Treesh, which is what he gave to my father, Henry." (T. 3129-3130.)

The Ohio Supreme Court correctly determined that the victim impact evidence did not violate the Constitution. The court held that the family sentencing recommendation was harmless because the jury did not hear it, the evidence of guilt was overwhelming, and the trial court did not use it in imposing the death sentence:

> In his proposition, Treesh contends that the objectionable victim-impact testimony was heard by the jury. But Luckason's improper sentencing recommendation occurred before the judge, after the jury had made its sentencing recommendation and had been excused. This court presumes that the trial judge considers only relevant, competent evidence in arriving at his or her judgment. *[State v.] Post*, 32 Ohio St. 3d at 384, 513 N.E.2d at 759 [1987]. Though Luckason's emotional plea for the death penalty was heard directly by the court – in contrast to the prosecutor's second-hand recital of the brother's recommendation in [*State v. Goodwin*, 84 Ohio St. 3d 331, 343 (1999)] – there is no indication here that the trial court relied on Luckason's recommendation. *See State v. Allard* (1996), 75 Ohio St. 3d 482, 491 . . . On the contrary, when ruling on a pretrial motion to exclude victim-impact testimony, the trial judge prohibited the state from presenting "evidence

47

> concerning the victims as nonstatutory aggravating circumstances during the penalty phase," indicating that the court was aware of the limitations on victim-impact evidence.  And the court did not refer to Luckason's improper sentencing recommendation either orally, at sentencing, or in the court's written sentencing opinion.   For the forgoing reasons, appellant's seventeenth proposition of law lacks merit.

*Treesh*, 90 Ohio St. 3d at 488-89.

The court agrees with that analysis and denies Treesh's claim of error. *See, e.g.*, *Cooey v. Coyle*, 289 F.3d 882, 910-11 (6th Cir. 2002), *cert. denied*, 538 U.S. 947 (2003).

> 18.[17]   *The Trial Court's Refusal to Allow an Important Witness to Testify for Treesh During the Mitigation Phase Denied Treesh a Fair Trial and a Reliable Sentencing Determination.*

In this claim, Treesh argues that the trial court erred to his detriment by excluding testimony by an experienced criminal attorney, Al Purola, to establish that in light of the crimes for which Treesh had been convicted (aggravated murder with three gun specifications) (3 years each), Treesh, who was 31 at the time  of his trial, would have no possibility of release before he reached the age of sixty (31 + 20 + 9)[18] even were he given the lowest minimum term of years possible in a life sentence for aggravated murder. Treesh wished to present this evidence to rebut the prosecution's claim of future dangerousness.

The Ohio appellate court found:

> R.C. 2947.06 provides that "[t]he trial court *may* hear testimony in mitigation of a sentence" including the testimony of the prosecuting attorney in behalf of the state, any pre-sentence investigation reports, and the reports

---

[17]   This claim is properly preserved for habeas review; the Respondent does not argue          otherwise.

[18]   It was later stipulated by the prosecutor that they would seek to run the gun specifications concurrently, for a total of 3 years, rather than consecutively for a total of 9 years. (T. 2890-2891).

of court-appointed psychologists or psychiatrists."  The word 'may' is permissive in nature * * * and thus, it is in the discretion of the court whether or not to allow the defendant to give testimony.  *State v. Payton* (Aug. 21, 1987), *Erie App*. No. E-86-36, unreported, at 12-13, 1987 Ohio App. LEXIS 8425.

In this case, we determine that the trial court did not abuse its discretion in disallowing the testimony of Attorney Purola during the mitigation phase based on the lack of relevancy and the potential inaccuracies and misstatements involved in the proffered statements.  We further note that appellant presented the testimony of McPherson regarding the recidivism rate of released offenders over the age of fifty to sixty years old.  Consequently, the jury was provided with testimony pertaining to the gravity of the threat appellant would pose to the community if released from incarceration after serving a life sentence.  Additionally, based on the jury instructions, the jury was able to consider a life sentence of twenty or thirty years with parole eligibility. . . .

*State v. Treesh*, No. 95-L-057 at *120-127 (11th Dist. Oct. 16, 1998) (A. 359-361)

This court agrees, particularly in light of Dr. Sandra McPherson's testimony:

Q.     [H]ave you had occasion to study recidivism among adult males?

A.     Yes.

Q.     And by recidivism I mean the likelihood that they repeat their offenses or commit offenses*?*

A.     Correct.

Q.     Correct?

A.     Correct.

Q.     And are you familiar with the crime rate for 60 year old males in the United States?

A.     The specific rate I don't have in my head, I know where to find it. I am familiar with the patterning of criminal activity over the life span, and I could – I'd have to look up the actual stats.

Q.     But why don't you describe for the jury the patterning of criminal activity over a life time?

A.     Well, in so called career criminals or persons with an active criminal life style at different points in their life, the high point of activity occurs somewhere between the late teens and up through about age 40.  After that point they begin to reduce in number of crimes they commit, with a fairly rapid drop between 45 and 50.  There are

49

>       relatively few crimes in the pop – in that population occurring after
>       55, over 60, or 65 years of age.

(T. 2951-2952.)

The jury clearly had before it the testimony it needed to assess Treesh's likelihood of future

dangerousness.  Thus, Attorney Purola's testimony was cumulative and Treesh suffered no prejudice

from its exclusion.  *See, e.g.*, *Blanton v. Elo*, 186 F.3d 712, 716 (6th Cir. 1999).  This issue is

without merit.

> 23.[19]    *Treesh was Denied a Fair Trial and a reliable Sentencing Proceeding When the*
> *Trial Court Allowed the Jurors to Return to the Community before Commencement*
> *of the Sentencing Proceeding, and then Failed to Voir Dire the Jurors about their*
> *Exposure to Improper Influences During that Five-Day Break.*

In this claim for relief, Treesh argues that the failure of the trial judge to *voir dire* jurors

regarding their exposure to improper influence following a five day break between the end of the

guilt phase and the beginning of the sentencing phase (when the jurors were permitted to return

home) denied him a fair trial and reliable sentencing procedure. This court disagrees.  Before

releasing the jury to the community following the guilt phase of trial, the judge cautioned jurors as

follows:

>       Ladies and gentlemen of the jury, at this point I have two options.  If you can
>       promise me to follow my instructions and not discuss this case with anyone,
>       nor let anyone discuss this case with you, and do not read the paper, listen
>       to the radio, or watch any television, nor let anyone, including the media,
>       discuss this case with you, I will adjourn this matter until Tuesday morning
>       at 9:00 o'clock, you will be able to return to your homes.  If you do not abide
>       by these instructions, I will have to sequester you over the weekend.  You
>       have followed my instructions so well that I don't believe there will be any
>       problems.

---

[19]    This claim was not preserved for habeas review because it was not presented to
the state courts in timely fashion.  Nevertheless and in an abundance of caution,
the court reviews the claim on its merits to ensure that no miscarriage of justice
occurred.  It did not.

> If you can all, again promise me that you will not discuss this matter with
> your family or have any discussions amongst yourselves even if you happen
> to see each other until we return to the mitigation phases, which will be
> Tuesday morning at 9:15. Can you all promise me that?
>
> (All jurors collectively answered yes.)

*State v. Treesh*, 97-L-080, at 17-18; (T. 2875-2876). Appx. Vol. VII, at 134-35.

Absent evidence to the contrary, this court assumes that the jurors followed the instructions of the trial judge. *See, e.g., Richardson v. Marsh*, 481 U.S. 200, 206-207 (1987); *Washington v. Hofbauer*, 228 F.3d 689, 706 (6th Cir. 2000). As Treesh offers no evidence of improper contacts or influences by the jury members during the five day break between guilt and sentencing proceedings (Pet. 51-54), the court denies this claim for relief.

### B. Prosecutorial Misconduct

Prosecutorial misconduct must be so egregious as to deny petitioner a fundamentally fair trial before habeas corpus relief becomes available. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643-45 (1974); *Hamblin v. Mitchell*, 354 F.3d 482, 494 (6th Cir. 2003), *cert. denied*, 125 S. Ct. 344 (2004). In this regard, "'the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor.'" *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)); *accord Smith v. Mitchell*, 348 F.3d 177, 210 (6th Cir. 2003), *cert. denied*, 125 S. Ct. 278 (2004). Specifically, the Sixth Circuit takes into account "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Hamblin*, 354 F.3d at 494-95 (quoting *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982)); *accord Frazier v. Huffman*, 343 F.3d 780, 791 (6th Cir. 2003), *cert. denied*, 541 U.S. 1095

51

(2004); *Hutchison v. Bell*, 303 F.3d 720, 750 (6th Cir. 2002), *cert. denied*, 539 U.S. 944 (2003); *Byrd*, 209 F.3d at 529. In habeas corpus cases, the inquiry is directed to deciding whether the state court's determination of the issue was an unreasonable application of clearly established federal law. *Frazier*, 343 F.3d at 793. *See, e.g., Bowling v. Parker*, 344 F.3d 487, 514 (6th Cir. 2003), *cert. denied*, 125 S. Ct. 281 (2004) (prosecutor cannot comment on a defendant's decision not to testify at trial, although he may summarize the evidence and comment on its quantitative and qualitative significance); *United States v. Payne*, 2 F.3d 706, 715-16 (6th Cir. 1993) (inflammatory remarks in opening and closing statements and throughout trial were not cured by cautionary instructions); *United States v. Roberts*, 986 F.2d 1026, 1031 (6th Cir. 1993) (closing argument that appeals to the community conscience was cured by instructions). The giving of cautionary instructions also factors into the calculus of determining whether fundamental fairness was denied. *Serra,* 4 F.3d at 1356. Extensive prosecutorial misconduct during trial and during closing argument justifies the granting of a writ of habeas corpus. *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000). However, where the evidence pointing to the defendant's guilt is strong and the prosecutor's improper comments go to the nature and intent of the crime, not to the defendant's guilt or innocence of the crime, the improper comments may be "error, but the jury would probably have returned the verdict of guilty anyway," and habeas relief is not warranted. *Hamblin*, 354 F.3d at 495.

The Sixth Circuit has held that some statements and actions by prosecutors are not in fact misconduct. For instance, when a prosecutor said, "Everyone available testified," that statement had other meanings beside being a comment on the petitioner's right to testify, and no constitutional error occurred. *Martin v. Mitchell*, 280 F.3d 594, 618-619 (6th Cir.), *cert. denied*, 539 U.S. 938 (2003). In another case, failure to disclose the identity of a doctor used as a rebuttal witness until

after the defense doctor testified was not prosecutorial misconduct.  *Lorraine v. Coyle*, 291 F.3d 416, 439-43 (6th Cir. 2002), *amended on reh'g*, 307 F.3d 459 (6th Cir. 2002), *cert. denied*, 538 U.S. 947 (2003).

> 2.[20]    *Mr. Treesh's Custodial Statements Violated His Constitutional Rights. All Statements Obtained in Violation of Miranda Violate the Protections Under the Fifth, Sixth, Eighth and Fourteenth Amendments.*

In this claim, Treesh argues that he was not *Mirandized* when he was arrested; that he did not validly waive his rights because he was high on cocaine and suffering from lack of sleep and Attention Deficit Hyperactivity Disorder; that the second *Miranda* warnings given to him upon his arrival at the Eastlake Police Department were defective; and that he was interrogated after he requested counsel, in violation of *Miranda*.  *See, e.g.*, *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966).  The Ohio Supreme Court reviewed and rejected each of these arguments, as follows.

> [A] defendant who is subjected to custodial interrogation must be advised of his or her *Miranda* rights and make a knowing and intelligent waiver of those rights before statements obtained during the interrogation will be admissible.  It is also well established, however, that a suspect who receives adequate *Miranda* warnings prior to a custodial interrogation need not be warned again before each subsequent interrogation.  *Wyrick v. Fields* (1982), 459 U.S. 42, 48-49; . . . *State v. Barnes* (1986), 25 Ohio St. 3d 203, 208;  See, also, *State v. Brewer* (1990), 48 Ohio St. 3d 50, 58-59. Police are not required to readminister the *Miranda* warnings when a relatively short period of time has elapsed since the initial warnings.  *State v. Mack*, 73 Ohio St. 3d at 513-514. . . Courts look to the totality of the circumstances when deciding whether initial warnings remain effective for subsequent interrogations. *State v. Roberts* (1987), 32 Ohio St. 3d 225, 232. . . .

---

[20]    This claim is properly preserved for habeas review; the Respondent does not argue otherwise.

53

In *Barnes, supra,* the defendant sought to suppress inculpatory statements made twenty-four hours after being advised of his *Miranda* rights. We concluded that "[a]lthough re-reading appellant's rights to him * * * would have been an extra precaution, it is not one mandated by the Ohio or United States Constitutions." *Id.,* 25 Ohio St. 3d at 208.  In *Brewer, supra,* the suspect received *Miranda* warnings from one police department early in the evening and made inculpatory statements to officers of a different police department the following day without being readvised of his *Miranda* rights. We noted that while a "great deal of time" had elapsed since the original *Miranda* warnings, the subsequent interrogation was "part of a series of discussions" that appellant had with police, during which the appellant had indicated his awareness of his rights.  *Id.,*  Accordingly, based on the totality of the circumstances, no new warnings were required.  *Id.*

In this case, Treesh was arrested just after midnight on the night of the robbery.  The arresting officer, then a five-year veteran of the Cleveland Police Department, testified that he advised Treesh of his *Miranda* rights as Treesh was being handcuffed.  When asked to specify exactly what he said, the officer recited the four warnings required by *Miranda.*  The officer testified that he asked Treesh if he understood those rights.  When Treesh did not respond, the officer began to repeat the warnings until Treesh "turned and said, 'Yeah, yeah, I know.'"  On cross-examination, Treesh's attorney questioned whether the officer had, in fact, recited the appropriate warnings, and the officer responded, "Sir, I make it a point to *Mirandize* everybody I arrest."  For his part, Treesh testified at the suppression hearing that no one administered *Miranda* rights at the scene of his arrest.

Treesh arrived at the Eastlake Police Department less than three hours later and was immediately taken to a booking room.  Lieutenant Thomas Doyle testified that he was in the booking room when Treesh entered, and that he immediately advised Treesh of his *Miranda* rights. The booking room was equipped with a video recorder.  According to the transcript of the voice-enhanced booking-room videotape, however, Doyle's rewarning was incomplete. Doyle asked Treesh, "Do you understand your *Miranda* rights? I'm going to ask you some questions for the next hour or so, two hours or three hours.  You have the right to answer the questions that I ask. Stop me any time. [Inaudible]  Do you understand that?  Okay." According to Doyle, Treesh did not appear under the influence of drugs or alcohol, and indicated a willingness to talk.

Treesh agreed to talk to Doyle and was questioned, with interruptions, for the next several hours. At 7:40 that morning, an FBI agent came to Eastlake to question Treesh.  He advised Treesh of his rights, and asked him if he wanted to waive those rights. Treesh read the waiver form and signed it, and later signed another waiver form in which Doyle was listed as the warning officer. On at least two occasions during this series of interviews, Treesh

verbally indicated an awareness of his rights.  When Doyle woke Treesh at 6:57 a.m., he asked Treesh to recite his rights, and Treesh said, "I have the right to remain silent.   Anything I say can and will be used against me in a court of law, blasé, blasé, blasé." [*Sic.*]  Later, Doyle attempted to warn him again of his rights, and Treesh said, "You told me this before.  * * * I already know all my rights."

The dissenting judge on the appellate panel concluded, and we agree, that the warnings Doyle first conveyed to Treesh upon his arrival at Eastlake were "a far cry from the information required to be conveyed to an accused.  Appellant's 'rights' did not include an obligation, as stated to him at the Eastlake Police Station, to answer the officer's questions."  O'Neill, J., dissenting, at 2.  Doyle misstated Treesh's right to silence and neglected to inform Treesh that any statement could be used against him in court.  And Doyle failed to specifically mention that Treesh had the right to have an attorney present during interrogation.

Even so, we disagree with the dissenting judge's conclusion that Doyle's inadequate readvisement of rights at Eastlake compels reversal.  On the authority of *Roberts, Barnes,* and *Brewer, supra,* we agree instead with the majority of the court of appeals that "the first partial re-warning given by Doyle at approximately 2:28 a.m. was sufficient in light of [the arresting officer's] earlier warning" that occurred just two hours before Treesh's arrival at Eastlake.   Accord *Mack, supra,* 73 Ohio St. 3d at 512-514. . .; *State v. Groves* (Mo.1983), 646 S.W.2d 82; *Evans v. McCotter* (C.A.5, 1986), 790 F.2d 1232, 1237-1238.  Though the testimony at the suppression hearing conflicted as to whether the arresting officer actually recited the *Miranda* warnings, the trial court implicitly found the arresting officer's testimony about the arrest more credible than Treesh's.  Weight of evidence and credibility of witnesses are primarily for the trier of fact – a principle applicable to suppression hearings as well as trials.  *State v. Fanning* (1982), 1 Ohio St. 3d 19, 20.  We will not substitute our judgment for that of the trial court on this issue. The full arrest warning, viewed in conjunction with the partial rewarnings at the interrogations, indicates that Treesh was sufficiently apprised of his *Miranda* rights.

2. Voluntariness of Waiver

Treesh contends that regardless of the adequacy of the Miranda warnings, his waiver of those rights was not voluntary. "While voluntary waiver and voluntary confession are separate issues, the same test is used to determine both, i.e., whether the action was voluntary under the totality of the circumstances."  *State v. Clark* (1988), 38 Ohio St. 3d 252, 261, 527 N.E.2d 844, 854.  "In *Colorado v. Connelly* (1986), 479 U.S. 157 [107 S. Ct. 515, 93 L. Ed. 2d 473], the court held that 'police overreaching' is a prerequisite to a finding of involuntariness.  Evidence of use by the interrogators of an inherently coercive tactic (e.g., physical abuse, threats, deprivation of food,

medical treatment, or sleep) will trigger the totality of the circumstances analysis." *Id.*  Accordingly, we need not assess the totality of the circumstances unless we find that the tactics used by the detectives were coercive. *Id.*

In *Clark*, *supra*, the appellant alleged that his mental condition negated his capacity to act voluntarily.  This court determined, however, that assessment of the totality of the circumstances was unnecessary. *Id.*  Officers allowed the appellant to use the restroom, provided coffee and cigarettes, and made no threats or promises.  Though assessment of the totality of the circumstances was unnecessary, this court examined the totality of the circumstances anyway and concluded that appellant voluntarily gave his waiver and confession. *Id.*  Though the defense contended that brain damage from a suicide attempt impaired appellant's ability to make choices, the appellant acknowledged several times that he understood  his rights and signed a written waiver. *Id.*

Here, Treesh contends that his "tiredness,"and "cocaine high"impaired his capacity to make informed decisions during the interrogation and that the officers never once asked him if he wanted to stop and rest.  But like the court of appeals, we find no coercive police conduct that would trigger the totality-of-the-circumstances test.  Testimony at the suppression hearing reveals that Treesh was permitted to sleep during breaks in the interrogation.  The transcript of the booking-room videotape confirms that Treesh spoke coherently and was aware of his surroundings.  Treesh was offered coffee and other refreshments on multiple occasions, as well as lotion soap and a disinfectant for a small wound.  Like the appellant in *Clark*, *supra*, Treesh read and signed a written waiver and indicated on several occasions that he understood his rights. Assuming, arguendo, that assessment of the totality of the circumstances is necessary in this case, we cannot say that appellant's waiver was improperly obtained.

3. Minnick/Edwards – Request for Counsel

 Treesh also argues that questioning continued despite requests for counsel.  It is axiomatic that "an accused who requests an attorney, 'having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.'" *Minnick v. Mississippi* (1990), 498 U.S. 146, 150, 111 S. Ct. 486, 489, 112 L. Ed. 2d 489, 496, quoting *Edwards v. Arizona* (1981), 451 U.S. 477, 484-485, 101 S. Ct. 1880, 1885, 68 L. Ed. 2d 378, 386; *see, also*, *State v. Dunlap* (1995), 73 Ohio St. 3d 308, 313, 652 N.E.2d 988, 994; *State v. Knuckles* (1992), 65 Ohio St. 3d 494, 605 N.E.2d 54, paragraph one of the syllabus.  In *Knuckles*, this court noted that the threshold inquiry is "'whether the accused actually invoked his right to

counsel.'" *Id.* at 496, 605 N.E.2d at 55, quoting *Smith v. Illinois* (1984), 469 U.S. 91, 95, 105 S. Ct. 490, 492-493, 83 L. Ed. 2d 488, 493-494.

Here, Treesh testified that he asked for counsel immediately after his arrival at Eastlake.  According to Doyle, however, Treesh never requested an attorney until 2 p.m., when Doyle confronted Treesh and Brooks with the store clerk's statement.  At that point, according to Doyle, Treesh and Brooks conferred, and "decided that they wanted to have a prosecutor and an attorney present and they'd only give statements that was [sic] possible to get out of the death penalty."  Doyle responded that there would be no deals struck in return for a statement, and that no prosecutor was coming down. Treesh and Brooks then refused to discuss the Eastlake crime any further, but continued to discuss other matters.

Treesh's desire for the presence of an attorney appeared to be for the limited purpose of making a deal with the prosecutor to avoid the death penalty. Assuming that Treesh's request was an invocation of counsel for purposes of Edwards, the interrogating officers treated it as such. The officers did not attempt to elicit any further statements regarding the Eastlake case from Treesh, and Treesh willingly spoke about other crimes.

*Treesh*, 90 Ohio St. 3d at 470-72.  Petitioner has not shown that the above analysis either contradicts or misapplies established United States Supreme Court precedent.  The state court found that the arresting officer advised Treesh of his *Miranda* rights during Treesh's arrest.  It also found that although the partial re-warning given at the Eastlake Police Station was defective, the second warnings must be viewed in conjunction with the fact that he had previously received *Miranda* warnings and that he was familiar with the criminal justice system.  The state court also found that neither Treesh's lack of sleep nor his cocaine use impaired his capacity to comprehend and validly waive his *Miranda* rights in light of the finding that he spoke coherently and was aware of his surroundings.  Furthermore, contrary to Petitioner's argument, the state court found that the police did not question him in the face of a request for counsel.  Under these circumstances, the court finds that Petitioner has not shown by clear and convincing evidence that the state court's factual findings were clearly erroneous.  Furthermore, the court finds that the state court's determination was not

57

contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.  The court therefore denies this claim for relief.

> *3.*[21]  *Mr. Treesh was Denied Due Process and a Fair Trial, and the State Failed to Comply with its Obligations under* Brady v. Maryland *and its Progeny When the State Lost, and/or Permitted the Destruction of Material and Exculpatory Evidence Prior to Trial and Before the Defense Could Examine Such Evidence.*

> *4.*[22]  *The Case Against Petitioner Should Have Been Dismissed Once the Trial Court Learned that the State had Knowingly Permitted the Evidence to be Destroyed.*

Treesh argues in regard to the above-mentioned grounds for relief that the State improperly withheld and/or destroyed evidence crucial to his case in violation of his constitutional rights.  In particular, Treesh argues that a plastic holster, a second gun (believed to belong to Mr. Dupree), wall panels and a ramp from the crime scene which contained bullet holes, the remains or fragments of bullets, and blood spatter evidence were improperly lost or destroyed before Treesh could examine that evidence. Treesh claims that these items, had they been available, might have proved or corroborated Treesh's version of the facts that the shooting was accidental during a struggle with Dupree.  The court finds that there was no prejudicial error.

The Constitution guarantees access to evidence.  *United States v. Wright*, 260 F.3d 568, 570 (6th Cir. 2001). Separate tests are used to determine whether the government's failure to preserve evidence constitutes a due process violation in cases where "materially exculpatory" evidence is not accessible, versus cases where "potentially useful" evidence is not accessible. *Id.* The government violates a defendant's due process rights when it does not preserve "materially exculpatory"

---

[21]  This claim is properly preserved for habeas review; the Respondent does not argue otherwise.

[22]  This claim is properly preserved for habeas review; the Respondent does not argue otherwise.

evidence. *California v. Trombetta*, 467 U.S. 479, 488-89 (1984); *Wright*, 260 F.3d at 570; *Caldwell v. Russell*, 181 F.3d 731, 738 (6th Cir. 1999). For evidence to meet this standard, it must be both exculpatory before its destruction and the defendant must be unable to obtain comparable evidence by other reasonably available means. *Trombetta*, 467 U.S. at 488-89: *Wright*, 260 F.3d at 570-71. The destruction of materially exculpatory evidence violates the defendant's due process rights, regardless of whether the government acted in bad faith. *Trombetta*, 467 U.S. at 488; *Wright*, 260 F.3d at 571.

To establish a due process violation for the failure to preserve "potentially useful" evidence, a defendant must show that: (1) the government acted in bad faith in failing to preserve the evidence; (2) the exculpatory value of the evidence was apparent before its destruction; and (3) the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other means. *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988); *Monzo v. Edwards*, 281 F.3d 568, 580 (6th Cir. 2002); *Wright*, 260 F.3d at 571. The finding of bad faith is particularly important. *Youngblood*, 488 U.S. at 58; *Caldwell*, 181 F.3d at 739. A determination of bad faith turns upon the government's knowledge of the evidence's exculpatory value at the time it was lost or destroyed. *Youngblood*, 488 U.S. at 56-57 n.8; *Wright*, 260 F.3d at 571. Negligence in failing to preserve exculpatory evidence is insufficient to establish bad faith. *Wright*, 260 F.3d at 571; *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996).

The Ohio Supreme Court ruled on this claim as follows:

> The nylon holster was inadvertently destroyed by Daniel Terriaco, the
> manager of the Vine Street News, after the police had finished processing the
> scene. By that time, however, an employee of the Lake County Regional
> Forensic Laboratory had already photographed the holster and its location
> on the floor. According to Terriaco, he was distraught by the large amounts

59

of blood in the store, found the holster while cleaning, and threw it away without realizing what it was. Mitchell Wisniewski, a firearms expert employed by the Lake County Regional Forensic Laboratory, testified that he chose not to collect the holster from the scene because he would not have been performing comparison tests on it, and because it was his understanding that Eastlake police would collect the holster after the Lake County crime lab finished processing the crime scene. Apparently, Eastlake never retrieved the holster. Even so, we perceive no prejudice to appellant resulting from the inadvertent destruction of the holster. Photographs taken by David Green of the Lake County crime lab were disclosed to defense counsel during discovery and utilized by the defense at trial.

Appellant also alleges that he was denied a fair trial because the state failed to maintain as evidence a floor ramp that connected the rear of the Vine Street News with the video arcade area. Lieutenant Doyle testified that he had returned to the Vine Street News after the crime in order to investigate Treesh's claim that Dupree had fired a weapon at him. At that time, Doyle recovered a spent nine-millimeter bullet from the ramp and turned it over to the Lake County crime lab.  Later, the store manager destroyed the ramp while cleaning the store.  We discern no prejudice to Treesh resulting from the store manager's destruction of the ramp.  Photographs depicting the ramp and indicating the location where the bullet penetrated the ramp were introduced at trial and adequately preserved the ramp's evidentiary value. *See*  [Ohio] Crim.R. 26.   The state disclosed still photographs and a videotape of the entire crime scene to defense counsel prior to trial, as well as the spent bullets and casings recovered from the scene.  Moreover, testimony at trial revealed that the bullet Doyle recovered from the ramp came from Treesh's nine-millimeter handgun, not Dupree's .25 caliber weapon.

Treesh also contends that the failure to preserve certain wall panels and doors where bullets had been found rendered it impossible to reconstruct the precise trajectory of bullets fired. But the police took photographs and videotapes indicating the location of the spent bullets and casings in the store, and disclosed this information to the defense. *See* Crim.R. 26. Measurements of the entire store, including the location of the spent bullets and casings, were taken by Officer Wisniewski at the scene. Based on this information, Treesh's own investigator constructed a detailed shadowbox reconstruction of the crime scene prior to trial, which included angles of fired bullets. At trial, Officer Wisniewski testified at length regarding the locations of the spent bullets and casings. Accordingly, Treesh suffered no prejudice from the state's failure to preserve the wall panels and doors from the Vine Street News.

*Treesh*, 90 Ohio St. 3d at 474-76.

60

Treesh's claim fails for a number of reasons.  Treesh has demonstrated no bad faith on the part of the police officers or the Vine Street News manager who was understandably anxious to clean up and reopen the store.  More importantly, however, none of the clean-up occurred before the crime scene was extensively photographed.  Treesh's own investigator used those photos and the witness testimony to create an elaborate "shadow box" depicting the scene of the crime (including bullet trajectories) which was used in trial to demonstrate the events that occurred that day.  There was, in short, no prejudice shown as a result of destruction of potentially useful evidence shortly after the murder. The court finds that the decision of the Ohio Supreme Court was not contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.

8.[23]     *There was Prosecutorial Misconduct Throughout the Guilt/innocence Phase of the Trial.*

In this claim of prosecutorial misconduct, Treesh argues that many acts by the prosecutor denied him of due process of law.  The acts he complains of include:

a.     *The prosecutor repeatedly asked potential jurors if they could impose the death penalty on Treesh if he were convicted.*

These questions were properly asked during the "death qualification" of the jury.  *See , e.g., Bell v. Cone*, 535 U.S. 685, 707 n.5 (2002).

b.     *The prosecutor unduly emphasized for nearly all of the potential jurors that their sentencing decision was to be only a "recommendation" to the trial court.*

---

[23]     This claim is properly preserved for habeas review; the Respondent does not argue otherwise.

61

This is a correct statement of the law.  *See, e.g.*,  *Mapes v. Coyle*, 171 F.3d 408, 414-415 (6th Cir. 1999).

> c.     *On several occasions, the prosecutor affirmatively misstated the law by telling the prospective jurors that a sentence less than death would also be a recommendation, when it is not under Ohio law.*

Treesh fails to explain how this statement prejudiced his trial, particularly in light of the judge's correct instruction on this issue.  (T. 3076-77.)  *See, e.g.*, *Coe v. Bell*, 161 F.3d 320, 329 (6th Cir. 1998).

> d.     *The prosecutor also improperly instructed the jury as to the verdict necessary to get to the sentencing phase of the proceedings.  By telling the jury that it would need to find defendant guilty of the capital specifications, the prosecutor violated Ohio Rev. Code Ann. § 2929.03(B), and attempted to tailor the verdict so the penalty sought by the prosecutor would be reached.*

Treesh fails to point out any evidence that the prosecutor erred.  Furthermore, the court finds that even if the prosecutor did err, any error was non-prejudicial in light of the trial judge's correct instruction on the issue.  (T. 2846-58.)  *Coe*, 161 F.3d at 329.

> e.     *The prosecutor requested that jurors "give me your word" that a guilty verdict would be returned if the jury is convinced of the defendant's guilt.*

During *voir dire*, the prosecutor asked the jurors, "If you are convinced beyond a reasonable doubt, according to the law that the judge gives you, the facts of this case, the Defendant is guilty, will you give me your word if that happens, that if proven, you will all return a verdict of guilty?"  Defense counsel objected, and the trial court sustained the objection.  The state appellate court determined that the prosecutor's question was  improper, but concluded that Treesh suffered no prejudice.  This court agrees. Treesh offers no explanation of how he was prejudiced by the prosecutor's question.  The court also finds that this is an instance of a single remark, not intended to mislead the jury, which was immediately overruled. Therefore, the statement by the prosecutor

62

was not such as to deny Treesh a fundamentally fair trial.  *Donnelly*, 416 U.S. at 643-45. The claim is therefore denied. *See also Hamblin*, 354 F.3d at 494 (the Sixth Circuit takes into account "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury and; the strength of the competent proof to establish the guilt of the accused").

> f.      *The prosecutor badgered Treesh, questioned him about irrelevant and prejudicial matters, called attention to his prior criminal record in an improper way, and went beyond the scope of the direct examination.*

During direct examination, Treesh admitted to having been previously convicted of receiving stolen property, forgery, and burglary.  (T. 2518-19.)   On cross examination, the prosecutor asked Treesh if he had previous convictions.  (T. 2639.)  Treesh admitted to having previous convictions and defense counsel objected. (T. 2640.) Following argument by counsel, the trial judge sustained defense counsels' objection and ordered the prosecution not to follow that line of questioning; the prosecution complied. (T. 2640-42.)  Case law permits comments that are made in response "to the argument and strategy of defense counsel." *Byrd*, 209 F.3d at 535.  *See also Lockett v. Ohio*, 438 U.S. 586 (1978) (holding that the prosecutor's closing remarks that the evidence was "unrefuted" and "uncontradicted" added nothing to the impression that had already been created by the defendant's refusal to testify after the jury had been promised a defense by her counsel and told that the defendant would take the stand). As the prosecutor's question occurred only once, was a fair response to defendant's direct examination, and defense counsels' objection was immediately sustained, the court finds no constitutional violation. This claim is denied.

> g.      *The prosecutor failed to disclose material, exculpatory information in violation of his discovery obligations and his duties under* Brady v. Maryland*, and, in fact, lost*

> *and/or permitted the destruction of material, exculpatory evidence. And the*
> *prosecutor permitted its agents to conduct improper interviews with Treesh while*
> *he was in jail awaiting trial, and did so even though Treesh was represented by*
> *counsel and counsel had ordered that no such interviews occur.*

This claim has been addressed on the merits and found non-prejudicial in claims 3 and 4. They cannot, therefore be the basis of a claim of prejudicial prosecutorial misconduct. *Id.*

The court notes that neither party discussed the second sentence of this claim, regarding Treesh being interviewed in the absence of counsel, in their prosecutorial misconduct analysis. Instead, this issue is dealt with in claim 8 (Miranda), which is where this court discusses it. Furthermore, Treesh offers no evidence or particulars of the police improperly questioning him in express violation of his counsels' order that no interviews be conducted in counsels' absence. Under these circumstances, this court denies this sub-claim. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 548 (2003) (burden of proof of state misconduct in habeas proceedings is on petitioner); *McAdoo v. Elo*, 365 F.3d 487, 493-94 (6th Cir. 2004), *cert. denied*, 125 S. Ct. 168 (2004); *Mitchell v. Mason*, 325 F.3d 732, 737-38 (6th Cir. 2003), *cert. denied*, 125 S. Ct. 861 (2005).

The remaining claims of prosecutorial misconduct were correctly addressed by the Ohio Supreme Court, which reasonably applied clearly established United States Supreme Court constitutional law to Treesh's claims:

> In his seventh and fourteenth propositions of law, Treesh claims that
> improper statements by the prosecutor during voir dire and closing
> arguments denied him a fair trial. To address these propositions, we must
> first determine whether the prosecutor's remarks were improper; if so, we
> then consider whether the remarks prejudicially affected substantial rights
> of the accused. *State v. Smith* (1984), 14 Ohio St. 3d 13, 14. We evaluate
> the allegedly improper statements in the context of the entire trial. *State*
> *v. Keenan* (1993), 66 Ohio St. 3d 402, 410, 613 N.E.2d 203, 209. An
> improper comment does not affect a substantial right of the accused if it is

clear beyond a reasonable doubt that the  jury would have found the defendant guilty even without the improper comments.  *Smith, supra,* 14 Ohio St. 3d at 15. . .

First, Treesh challenges the prosecutor's statement to the jury that Treesh wanted them to believe that he unintentionally shot at the police officers who pursued him.   Specifically, the prosecutor said, "It's a story that he *concocted* * * *. He wants each one of you to believe that he accidentally killed Henry Dupree, that he mistakenly shot Louis Lauver in the head, *that he unintentionally shot at police officers at E. 174th and Grovewood* --." (Emphasis added.)   We agree with the court of appeals that the last clause of these remarks was improper.   Treesh himself admitted firing his weapon "at the police, over the tops of the cruisers," and the prosecutor could not deliberately misstate the evidence during summation in order to convince the jury that Treesh "concocted" stories or that his testimony generally lacked credibility. *See State v. Waddy* (1992), 63 Ohio St. 3d 424, 436. Even so, the trial court sustained defense counsel's objection, and Treesh has not demonstrated how this comment prejudiced him.

Second, the prosecutor told the jury that Treesh knew that there was an armed security guard in the store. . . . At trial, Lauver testified on direct examination that Treesh immediately demanded to know the whereabouts of the "armed security guard." Lauver reiterated this testimony on cross-examination, insisting that Treesh asked specifically about the presence of an armed guard. If the jury believed this portion of Lauver's testimony, it could reasonably infer that Treesh knew about the presence of an armed security guard before he entered the store. Accordingly, the prosecutor's assertion constituted a permissible comment based on a reasonable inference from trial evidence.  *See State v. Grant*, 67 Ohio St. 3d at 482 . . .

Third, Treesh objects to the prosecutor's assertion that " * * * we can't tell you exactly what happened back there.   There [are] only two people who knew, and one of them is dead right now."   Like the court of appeals, we see no impropriety in this statement.  Testimony at trial revealed that there were no eyewitnesses to the confrontation between Treesh and Dupree in the rear of the store, and Dupree died immediately thereafter. Though witness Plunkard was in a nearby viewing booth during Treesh's encounter with Dupree and heard gunshots, the booth's door remained closed during the confrontation. Indeed, the prosecutor's comment arguably helped the defense by underscoring a potential weakness in the state's aggravated murder case. Regardless, the trial court sustained defense counsel's objection, and Treesh has failed to demonstrate how this statement prejudiced him.

Fourth, Treesh contends that the prosecutor "attempted to make a lay witness into an expert on gun residue" in order to dispute the defense's

theory that Treesh's gun accidentally discharged during a struggle with Dupree. Treesh refers to the prosecutor's summary of the testimony of Sharon Rosenberg, a forensic scientist: "Sharon Rosenberg testified how the whole front of [Treesh's] T-shirt had no evidence of any type of gun powder residue, fouling, reddish nitrates, yet this gun supposedly is between the two of them the whole time, going off six times, you've got the [one] falling on the other, surely he'd have some fouling or some kind of gunshot residue on his shirt. There is none--." Like the court of appeals, we do not find this statement improper. The prosecutor neither misstated Rosenberg's testimony nor exaggerated her credentials.   Instead, the prosecutor merely suggested a reasonable inference that the jury could draw from Rosenberg's testimony and other trial evidence. "Prosecutors are entitled to latitude as to what the evidence has shown and what inferences can reasonably be drawn from the evidence." *Smith, supra,* 80 Ohio St. 3d at 111 . . .

Sixth, Treesh contends that the prosecutor committed prejudicial misconduct by suggesting to the jury, "If you are not satisfied with the way the investigation went, or do you think it could have been done better, give us a call after the trial is over, drop us a letter--."  The trial court sustained defense counsel's objection.  Like the court of appeals, we deem this statement improper and not based upon the evidence.  Even so, we agree with the court below that it did not impair appellant's right to a fair trial.

*Treesh*, 90 Ohio St. 3d at 465-68.

The court finds that the decision of the Ohio Supreme Court was not contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.  *See, e.g.*, *Donnelly*, 416 U.S. at 643-45; *Hamblin* , 354 F.3d at 494-96.

11.[24]    *Treesh was Denied Due Process and a Fair Trial When the State Improperly Solicited Testimony from its own Witness about Treesh's Invocation of his Right to Counsel.*

Treesh also argues that the prosecutor improperly solicited testimony from Detective Doyle concerning Treesh's invocation of his right to counsel.  The Ohio Supreme Court concluded that any error was harmless because of the overwhelming evidence against Treesh and because the trial

---

[24]    This claim is properly preserved for habeas review; the Respondent does not argue otherwise.

court issued a curative instruction to the jury that nothing could be inferred from Treesh's request

for counsel.  In denying this claim, the Ohio Supreme Court said:

> Treesh contends that the trial court erred when it failed to grant a motion for mistrial made during the direct examination of Detective Doyle. Doyle, the investigating officer in charge of Treesh's case, interviewed Treesh and Brooks at Eastlake following their arrest. At the station house, Doyle confronted Treesh and Brooks with the taped statement of the store clerk.
>
> At trial, the prosecutor asked Doyle what happened after Treesh heard Lauver's taped statement. Defense counsel immediately objected, fearing that the prosecutor was trying to elicit Treesh's request for an attorney. At sidebar, the prosecutor assured counsel that he was seeking testimony only about Treesh's request to make a deal – "nothing to do with counsel." But following the sidebar, when the prosecutor again asked Doyle what Treesh said after hearing Lauver's statement, Doyle answered, "he wanted a prosecutor to be present and he wanted an attorney."  Defense counsel immediately objected, and the court sustained the objection and provided a curative instruction.   At sidebar, the prosecutor said "that was a surprise to me." The following day, the defense [moved] for mistrial, which the trial court denied.
>
> We agree with appellant that it was improper for the prosecutor to elicit Doyle's testimony that Treesh had asked for an attorney. An accused who asserts his Fifth Amendment right to silence should not have the assertion of that constitutional right used against him. *Doyle v. Ohio* (1976), 426 U.S. 610. . . Since *Doyle,* the United States Supreme Court has clarified that "with respect to post-*Miranda* warnings 'silence,' * * * silence does not mean only muteness;  it includes the statement of a desire to remain silent, *as well as of a desire to remain silent until an attorney has been consulted.*" (Emphasis added.) *Wainwright v. Greenfield* (1986), 474 U.S. 284, 295 fn. 13.   Here, we agree with the court of appeals' view that "the inference that a juror could draw from Doyle's statement, is that appellant asked for an attorney after being confronted with the audio tape recording *because he was guilty.*   Consequently, the admission of this statement could bear on whether a juror could entertain a reasonable doubt as to appellant's guilt." (Emphasis added).
>
> The prosecutor's improper elicitation of testimony regarding Treesh's request for an attorney is especially troubling because defense counsel and the court had specifically warned the

> prosecutor to avoid the problem even before it occurred. Even so, we must determine whether Doyle's statement resulted in prejudicial error warranting reversal. *See Hayton v. Egeler* (C.A.6, 1977), 555 F.2d 599 prosecutor's attempt to impeach petitioner's alibi testimony by inquiring about post-arrest silence was erroneous, but harmless error beyond a reasonable doubt).
>
> The granting or denial of a motion for mistrial rests in the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. Crim. R. 33; *State v. Sage* (1987), 31 Ohio St. 3d 173, 182." A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened * * *." *State v. Reynolds* (1988), 49 Ohio App. 3d 27, 33. The granting of a mistrial is necessary only when a fair trial is no longer possible. *State v. Franklin* (1991), 62 Ohio St. 3d 118, 127. . . A single comment by a police officer as to a suspect's silence without any suggestion that the jury infer guilt from the silence constitutes harmless error. See *Meeks v. Havener* (C.A.6, 1976), 545 F.2d 9, 10.
>
> Here, the trial court immediately instructed the jury that "the fact that the Defendant requested an attorney is his Constitutional right to request one and cannot be used against him in any way." We presume that the jury followed the court's instructions, including instructions to disregard testimony. *State v. Loza* (1994), 71 Ohio St. 3d 61, 75, 641 N.E.2d 1082, 1100; *State v. Zuern* (1987), 32 Ohio St. 3d 56, 61, 512 N.E.2d 585, 590. Given the context of the prosecutor's question to Doyle and the curative instruction by the court, we conclude that the trial court did not abuse its discretion in denying appellant's motion for mistrial.

*Treesh*, 90 Ohio St. 3d at 478-80.

The court agrees with the Ohio Supreme Court's assessment of this issue that the curative instruction to the jury avoided error. As none of the prosecutorial errors proved prejudicial, the court finds that the Ohio court's decision on this issue is not contrary to or an unreasonable application of federal law.

### C. Sufficiency of Evidence / Actual Innocence

10.[25]   *The Convictions for Aggravated Murder and Attempted Murder Are Unconstitutional Because They Were Obtained with Insufficient Evidence.*

19.[26]   *The Aggravating Factors Do Not Outweigh the Mitigating Circumstances Beyond a Reasonable Doubt. The Evidence to Support the Death Sentence is Constitutionally Insufficient as a Matter of Law.*

As both of these claims deal with sufficiency of the evidence, the court analyzes them together.  In essence, Treesh argues in both claims that the evidence against him was insufficient to convict him of aggravated murder or sentence him to death because there was no intent to kill. He further alleges that his mental defect caused him to be susceptible to drug abuse which caused him to be more dangerous.

Sufficient evidence supports a conviction if, after viewing the evidence (and the inferences to be drawn therefrom) in the light most favorable to the prosecution, the court can conclude that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). This standard of review does not permit a federal court to make its own subjective determination of guilt or innocence.  The standard gives full play to the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to the ultimate facts.  *Herrera v. Collins*, 506 U.S. 390, 401-402 (1993). This due process guarantee of sufficiency of the evidence extends only to facts needed to establish the elements of the crime and not to the state's burden to

---

[25]   This claim is properly preserved for habeas review; the Respondent does not argue otherwise.

[26]   This claim is properly preserved for habeas review; the Respondent does not argue otherwise.

prove the absence of an affirmative defense. *Allen v. Redman*, 858 F.2d 1194, 1197-1198 (6th Cir. 1988).

Viewing the trial evidence in the light most favorable to the prosecution results in the following facts:  Treesh and Brooks entered the Vine Street News store intending to rob it.  Both men carried 9 mm handguns loaded with bullets designed for penetration and maximum stopping power.  While Brooks ordered the shopkeeper to empty the cash register, Treesh entered the security area.  Treesh proceeded to shoot Dupree, the security guard, four times.  Dupree died of two close range gunshot wounds to the chest.  Treesh and Brooks then left the store with the contents of the cash register.  On his way out, Treesh shot the shopkeeper twice, once in the jaw and once in the forearm.  During a high speed police chase through a residential area, Treesh shot at pursuing officers from a window of his car. The chase ended when the car crashed and Treesh exited the car, assumed an "action stance," pointed his gun, and thrice shot at the police officer pursuing the car. Treesh also fired multiple shots at a police officer pursuing him on foot before he was apprehended.

The Ohio Supreme Court found sufficient evidence supporting the charges.

> 1. Aggravated Murder of Dupree.
>
> Under R.C. 2903.01(B), the state was required to prove that Treesh "purposely caus[ed] the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, * * * aggravated robbery or robbery * * *."  A person acts purposely when he or she specifically intends to cause a certain result. R.C. 2901.22(A).  Because the intent of an accused dwells in his or her mind and can never be proved by the direct testimony of a third person, it must be gathered from the surrounding facts and circumstances, and the General Assembly has provided that intent to kill may be proven by inference. Former R.C. 2903.01(D), 139 Ohio Laws, Part I, 3-4.  See also, *In re Washington* (1998), 81 Ohio St. 3d 337, 340, 691 N.E.2d 285, 287. "[S]uch an intent may be inferred in a felony-murder when the offense and the manner of its commission would be likely to produce death." *State v. Garner*, 74 Ohio St. 3d at 60.

Like the court of appeals, we find sufficient, credible evidence in the record to support the jury's determination that Treesh purposely caused the death of Henry Dupree. Treesh and Brooks planned the armed robbery in advance and entered the Vine Street News with fully loaded, particularly lethal, weapons – a sawed-off shotgun and a nine-millimeter handgun containing Hydra-Shok bullets.  Even though the store clerk in the front of the store cooperated with Treesh and his accomplice, Treesh sought out Dupree in a separate area at the rear of the store. Treesh found Dupree sitting in a chair watching television, unaware of Treesh's presence in the rear of the store and unaware that a robbery was even occurring. Instead of simply turning around and returning to the front of the store to continue the robbery or flee, Treesh poked Dupree with his gun, ordered him to stand up, and shot him multiple times at close range.

Treesh claims that he merely attempted to disarm Dupree and that his gun discharged during a fierce hand-to-hand struggle – a contention that Treesh never mentioned to the police during his lengthy station house interrogation. But Plunkard, the witness who hid in a viewing booth at the rear of the store, heard no signs of a struggle prior to the gunshots. Plunkard testified that the shots sounded in a steady rhythm. The record also contains physical evidence and substantial, credible expert testimony to discount Treesh's contention that he shot Dupree during a struggle. Dupree's body lacked defensive wounds suggestive of a struggle. And despite Dupree's considerable loss of blood, a forensic serologist found no traces of blood identifiable as Dupree's on Treesh's jeans, shirt, or shoes. The lack of any significant smearing of blood spatters in the area of the alleged struggle also cast doubt on appellant's theory.

Circumstantial evidence and direct evidence inherently possess the same probative  value. *Jenks*, *supra*, [at] 61 Ohio St. 3d 259, 574 N.E.2d 492, paragraph one of the syllabus.  Dupree suffered two close-range shots in his chest, and we have repeatedly held that multiple close-range gunshots to a vital area tend to demonstrate a purpose to kill.  *See State v. Palmer* (1997), 80 Ohio St. 3d 543, 562, 702; *State v. Otte* (1996), 74 Ohio St. 3d 555, 564.

2. Attempted Aggravated Murders of Lauver and Stih.

Treesh also argues that the evidence was legally insufficient for the jury to conclude that Treesh attempted to commit the aggravated murders of Lauver and Sergeant Stih. R.C. 2923.02(A);  2903.01(B). We disagree. Treesh claims that he never intended to shoot Lauver, but aimed instead at the telephone behind Lauver. The physical evidence at trial, however, as well as Lauver's own testimony, reveals that even though Lauver cooperated with Treesh and his accomplice, Treesh raised his weapon and fired multiple shots at Lauver's face from close range as he left the store. At least one bullet struck Lauver in the face, and the presence of a spent,

71

fully mushroomed bullet in the floor nearby provided credible evidence that Lauver was struck a second time by a bullet that passed through his body. Even if only one bullet struck Lauver, we reject Treesh's unsupported contention that "one shot at a person is not indicative of intent to murder."

The record also contains sufficient evidence to show that during his attempt to flee, Treesh fired his weapon through the rear window of the car at Sergeant Stih's pursuing cruiser, assumed an "action stance" when he got out of the car, and continued firing at Stih until his gun was empty.   Stih testified that he lay across the front seat of his cruiser and backed away to avoid being hit, and that he later found a nine-millimeter hole in his cruiser's light bar.   Detective Ernie Iafelice, a Euclid officer who assisted in the recovery of evidence at the intersection where Treesh fired on Stih, noticed ricochet marks on Stih's vehicle.

Based on the total number of bullets fired and recovered from the Vine Street News and the area where police apprehended Treesh, the state's evidence suggests that Treesh must have reloaded his weapon at some point while attempting to flee, indicating that he was "not content to use it merely as a prop" to ward off pursuit. *State v. Dennis* (1997), 79 Ohio St. 3d 421, 439. Treesh also admitted telling the arresting officers immediately after his arrest that he wished he had killed them. Viewed in a light most favorable to the prosecution, the evidence is sufficient to support Treesh's convictions for attempted aggravated murder.

*Treesh*, 90 Ohio St. 3d at 484-86.

This court agrees that there was ample evidence which, when taken in the light most favorable to the prosecution,  including the number, circumstances, trajectory and ownership of the bullets, and the eye and ear witness testimony, allows a conclusion  that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See, e.g.*, *Jackson*, 443 U.S. at 318-319.

Treesh also contends that there was insufficient evidence to support the jury's finding that the aggravated circumstances outweighed the mitigating factors. He alleges that coupled with the insufficient evidence to prove the "purposeful" element of aggravated murder, the evidence of Treesh's ADHD and other mitigating factors outweigh the aggravating circumstances as a matter of law.  Treesh's mental defect allegedly contributed to his poor development and his learning

disabilities which caused him to be violent, impulsive, and reckless. Treesh's mental defect claim is analyzed below in his sixteenth claim and found to be without merit. Treesh's claim of insufficient evidence is therefore denied.

27.[27]     *Treesh is innocent of the Death Penalty, and it Would Be a Miscarriage of Justice to Allow His Sentence to Remain in Effect.*

Free-standing claims of actual innocence invoke *Herrera*, 506 U.S at 390.[28] The circuit courts are split on whether *Herrera* recognizes such a claim. Several courts have read *Herrera* as invalidating free-standing actual innocence claims in habeas. *Creel v. Johnson*, 162 F.3d 385, 395 (5th Cir. 1998); *Sellers v. Ward*, 135 F.3d 1333, 1338-1339 (10th Cir. 1998); *Meadows v. Delo*, 99 F.3d 280, 283 (8th Cir. 1996). Other courts have read *Herrera* as authorizing a free-standing claim of actual innocence, or have at least assumed for the sake of argument that habeas courts could consider free-standing claims of actual innocence. *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (*en banc*) (holding that "free-standing" actual innocence is a proper claim but not finding

---

[27]     This claim was not preserved for habeas review because it was not presented to the state courts in timely fashion. Nevertheless, and in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred. It did not.

[28]     Treesh's free-standing claim of actual innocence reads as follows:

290.     Fred Treesh is innocent of the death penalty, and it would be a miscarriage of justice to allow his sentence to remain in effect.

291.     The aggravating factors do not outweigh the mitigating circumstances beyond a reasonable doubt.

292.     Under these circumstances, it would be a miscarriage of justice to allow Treesh's death sentence to stand. *See, e.g.*, *Schlup v. Delo*, 513 U.S. 298 (1995). (Pet. 78.)

sufficient evidence of it); *Cornell v. Nix*, 119 F.3d 1329 (8th Cir. 1997); *O'Dell v. Netherland*, 95 F.3d 1214, 1246 n. 25 (4th Cir. 1996), *cert. granted in part*, 519 U.S. 1050 (1996), *aff'd*, 521 U.S. 151 (1997) (assuming for the sake of argument that "free standing" actual innocence states a claim but noting that the *Herrera* opinion at 506 U.S. at 416-417 seems to dictate otherwise).

In this analysis, the court assumes that Treesh may raise a "free-standing" claim of actual innocence. The Supreme Court has indicated that if such a claim exists, a petitioner must convince the Court "that those new facts unquestionably establish [Treesh's] innocence." *Schlup*, 513 U.S. at 316-317. Treesh has offered no new facts that "unquestionably establish [his] innocence." Rather, he only baldly asserts that he is actually innocent. Under the AEDPA, this court must presume that state determinations of factual issues are correct. 28 U.S.C. § 2254(e)(1). This presumption of correctness is rebuttable only by clear and convincing evidence otherwise. *Id.* Treesh offers no such evidence to rebut those findings and thus has shown no new facts that "unquestionably establish [his] innocence." His claim of actual innocence must therefore fail.

### D. Ineffective Assistance of Counsel

In order to establish ineffective assistance of counsel, it must be shown that counsels' performance was deficient and that the deficient performance prejudiced the defense and rendered the trial unfair and the result unreliable. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004); *Mallett v. United States*, 334 F.3d 491, 497 (6th Cir. 2003), *cert. denied,* 540 U.S. 1133 (2004); *Bugh v. Mitchell*, 329 F.3d 496, 513-14 (6th Cir. 2003), *cert. denied*, 540 U.S. 930 (2003); *McQueen v. Scroggy*, 99 F.3d 1302, 1310-11 (6th Cir. 1996), *overruled on other grounds by In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004), *vacated on other grounds by Bell v. Abdur'Rahman*, 125 S. Ct. 2991 (2005). That test applies to claims of

74

ineffective assistance of appellate counsel. *See Smith v. Jago*, 888 F.2d 399, 405 n.1 (6th Cir. 1989);

*Bowen v. Foltz*, 763 F.2d 191, 194 (6th Cir. 1985). Both prongs of the test must be met, but courts

are not required to conduct an analysis under both; the court need not address the question of

competence if it is easier to dispose of the claim due to the lack of prejudice. *Strickland,* 466 U.S.

at 697; *Baze*, 371 F.3d at 321; *Mallet*, 334 F.3d at 497.

The reviewing court's scrutiny of counsels' performance is highly deferential.  *Strickland*,

466 U.S. at 689. Indeed, "the court should recognize that counsel is strongly presumed to have

rendered adequate assistance and made all significant decisions in the exercise of reasonable

professional judgment." *Id.* at 690; *accord Bigelow*, 367 F.3d at 570; *Mallett,* 334 F.3d at 497;

*McQueen*, 99 F.3d at 1311. The court must also not indulge in hindsight, but must evaluate the

reasonableness of counsels' performance within the context of the circumstances at the time of the

alleged errors. *Strickland*, 466 U.S. at 690; *McQueen*, 99 F.3d at 1311; *Cobb v. Perini*, 832 F.2d

342, 347 (6th Cir. 1987). Indeed, trial counsels' tactical decisions are particularly difficult to attack,

*McQueen*, 99 F.3d at 1311, and a defendant's challenge to such decisions must overcome a

presumption that the challenged action might be considered sound trial strategy. *Darden v.

Wainwright*, 477 U.S. 168, 185-87 (1986); *Bigelow*, 367 F.3d at 570; *Bugh*, 329 F.3d at 513;

*McQueen,* 99 F.3d at 1311. Nonetheless, the court must make an independent judicial evaluation

of counsels' performance and not be swayed by the defendant's possible acquiescence of counsels'

performance at trial, *McQueen*, 99 F.3d at 1311; *Ward v. United States*, 995 F.2d 1317, 1322 (6th

Cir. 1993).  The court must also ensure that counsel acted reasonably under all the circumstances.

*Sims v. Livesay*, 970 F.2d 1575, 1580-81 (6th Cir. 1992)(counsel still has "a duty to make

reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary") (quoting *Strickland,* 466 U.S. at 691).

The right to effective assistance of counsel extends to closing arguments. *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). A state court of appeals' decision on this claim is not objectively unreasonable where counsel made several key points, even though he did not include other points that could have been made. *Id*.

To satisfy the prejudice prong of the *Strickland* test, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Where "one is left with pure speculation on whether the outcome of the trial or the penalty phase could have been any different," there is an insufficient showing of prejudice. *Baze*, 371 F.3d at 322. "The essential question is whether better lawyering would have produced a different result." *Ward*, 995 F.2d at 1321; *accord McQueen*, 99 F.3d at 1311. Notwithstanding this outcome determinative focus in *Strickland*, the Court in *Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993), clarified that:

> an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him.

Hence, the *Lockhart* Court instructs the reviewing courts to focus on whether counsel's errors have likely undermined the reliability of and confidence in the result, i.e., can one confidently say that the trial or proceeding has reached a fair and just result. *Id*.; *accord United States v. Cronic*, 466

U.S. 648, 658 (1984); *Mallett*, 334 F.3d at 497; *McQueen*, 99 F.3d at 1311. *But See Northrop v. Trippett*, 265 F.3d 372, 384-85 (6th Cir. 2001) (*Lockhart* does not supplant *Strickland* analysis). On balance, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686; *See also McQueen*, 99 F.3d at 1311-12.

A presumption of prejudice will arise in circumstances where: (1) there exists a complete denial of counsel or a denial of counsel at a critical stage of the defendant's trial; (2) defense counsel fails to subject the prosecution's case to meaningful adversarial testing; or (3) counsel is called upon to render assistance where competent counsel very likely could not. *Quintero v. Bell*, 368 F.3d 892, 893 (6th Cir. 2004), *cert denied*, 125 S. Ct. 1636 (2005) (counsel's acquiescence in allowing on the petitioner's jury seven jurors who had already convicted the petitioner's co-conspirators amounted to an "abandonment of meaningful adversarial testing" throughout the proceeding, and prejudice was presumed); *Caver v. Straub*, 349 F.3d 340, 349-350 (6th Cir. 2003) (citing *French v. Jones*, 332 F.3d 430, 438-439 (6th Cir. 2003), *cert. denied*, 540 U.S. 1018 (2003)) (jury re-instruction is a critical stage under *Cronic* and counsel's absence at that time is *per se* reversible error); *Mitchell*, 325 F.3d at 742 (court concludes that defendant was denied effective assistance, as counsel was absent at critical stages of case by being suspended from practice for a month before trial and by rarely talking to client before trial); *Moss v. United States*, 323 F.3d 445, 467 (6th Cir. 2003) (court applies *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980), successive representation did not constitute ineffective assistance of counsel as such representation did not adversely affect attorney's performance).

77

Finally, while trial-level errors that would be considered harmless when viewed in isolation might require reversal when considered cumulatively, "the accumulation of non-errors cannot collectively amount to a violation of due process." *Campbell v. United States*, 364 F.3d 727, 736 (6th Cir. 2004), *cert. denied*, 125 S. Ct. 987 (2005) (internal quotation omitted). Consequently, where a petitioner fails to show that any of the alleged instances of ineffective assistance of counsel deprived him of a fair trial, "he cannot show that the accumulation of these non-errors warrant relief." *Id.*

> 14.[29]  *Treesh was Denied the Effective Assistance of Counsel when his Lawyers Failed to Request a Blood Spatter Expert to Confront and Refute the State's Claim that the Victim was Shot while in a bent over Position and to Demonstrate that Treesh and the Victim were Engaged in a Struggle when the Victim was Shot.*

> 22.[30]  *Treesh was Denied Discovery and the Assistance of Experts (blood spatter and neurology) in the Post-Conviction Proceedings, thereby Denying him Due Process and Rendering those Proceedings Inadequate to Protect the Rights of a Death Sentenced Individual.*

In these claims of error, Treesh argues that counsel impermissibly failed to request blood spatter experts to mitigate, confront, and refute the State's claim the victim was not engaged in a struggle during the shooting and failed to call the neurologic expert to testify. The State introduced testimony of Dr. Carlos Santoscoy of the Cuyahoga County Coroner's Office, that the victim "was

---

[29]  This claim was not preserved for habeas review because it was not presented to the state courts in timely fashion. Nevertheless and in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred. It did not.

[30]  This claim was not preserved for review because Treesh failed to raise it in state court. Nevertheless and in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred. It did not.

bent over" when he was shot (T. 1735), and that he had no defensive wounds (T. 1750).  Based on

this statement, the State argued that no struggle took place but that Treesh intentionally shot Dupree.

The blood spatter analysis introduced by the State was based on photographs introduced at trial.

(T. 2191-920.)   The State also argued that blood spatter evidence at the crime scene corroborated

this theory.  (T. 2746, 2820.)  The Lake County Common Pleas Court determined that counsel were

not ineffective in failing to secure a blood spatter expert because "the record shows that there was

no evidence of the victim's blood on Treesh's clothing or tennis shoes.  This tends to negate the

claim that Treesh and the victim were struggling when the victim was shot.  Defense counsel also

thoroughly questioned the State's blood spatter analyst."  Amended Opinion and Judgment Entry,

Case No. 94 CR 000514, p. 3 (Aug. 13, 1998) (Appx. Vol. VI, p. 240).

The blood spatter evidence issue was raised in the fourth claim for relief wherein the court

found it to be without merit.  The failure to call a neurologist to testify will also be found to be

without merit in Treesh's sixteenth claim for relief.  Thus, Treesh cannot demonstrate that but for

counsels' errors, the result of the proceeding would have been different.

Treesh argues in his twenty-second claim for relief that he was denied discovery and the

assistance of a neurologic and blood spatter expert in the post-conviction relief proceedings.  Post-

conviction proceedings are civil rather than criminal proceedings. *Murray v. Giarratano*, 492 U.S.

1, 13 (1989). A state has no obligation to provide post-conviction review.  *Pennsylvania v. Finley*,

481 U.S. 551, 557 (1987); *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001).   Therefore,

challenges to a state's post-conviction procedures are not cognizable as independent claims in

habeas corpus proceedings unless state collateral review violates some independent constitutional

right, such as equal protection.  *Clark v. McLemore*, 291 F. Supp. 2d 535, 542 (E.D. Mich. 2003)

(citing *Montgomery v. Meloy*, 90 F.3d 1200, 1206 (7th Cir. 1996)). Treesh does not claim an equal protection violation. A petition for writ of habeas corpus is not the proper method for a criminal defendant to challenge errors or deficiencies in state post-conviction proceedings because the claims usually address collateral matters and not the underlying conviction giving rise to the defendant's incarceration. *Kirby v. Dutton*, 794 F.2d 245, 247 (6th Cir. 1986).

> 15.[31]  *Treesh Was Denied the Effective Assistance of Counsel in the Guilt/Innocence Phase of His Trial.*

In this claim, Treesh asserts the following sub-claims:

> a.  *Counsel failed to object, with a few exceptions, to the court's and prosecutor's constant use of the term "recommendation" in connection with possible sentencing duties. Counsel also failed to object to the court's instructing the jury that a second phase of trial would be held.*

This is a correct statement of Ohio law and has been upheld as constitutional in *Mapes*, 171 F.3d at 414-415, n.2. There was no lack of assistance of counsel when Treesh's counsel failed to object to its use.

> b.  *Counsel failed to object to the trial court or prosecutor instructing the jury that for the petitioner to receive the death penalty, it would be necessary for the jury to find the petitioner guilty of aggravated murder and at least one specification. In fact, the defense counsel themselves violated Ohio Rev. Code Ann. § 2929.03(B).*

This also is a correct statement of Ohio law. *Mapes*, 171 F.3d at 414-15 n.2. There was thus no lack of assistance of counsel when Treesh's counsel failed to object to its use.

---

[31]  This claim is properly preserved for habeas review; the Respondent does not argue otherwise.

80

> c. *Counsel failed to rehabilitate favorable jurors and failed to timely object to unfounded challenges for cause by the State.  Counsel also failed to object to the State's improper use of peremptory challenges to exclude jurors who had expressed some opposition to, and/or reluctance to impose, the death penalty.*

The Ohio Supreme Court rejected this claim:

> Treesh contends that his counsel were ineffective for failing to challenge two jurors, Cynthia Barth and Barbara Modica, during voir dire.  Treesh argues that counsel should have challenged Barth because she had taken paralegal classes taught by the prosecutor, Charles Coulson.  Treesh claims that counsel should have challenged juror Modica due to her media exposure about the case and her alleged predisposition in favor of the death penalty.  We find both contentions meritless.  It is unlikely that a challenge for cause, if made, would have succeeded in either case. Barth testified that her past affiliation with Coulson's paralegal course would not impair her ability to render a fair and impartial verdict. Likewise, though Modica admitted exposure to some newspaper articles about the case and admitted that she favored the death penalty "when it's warranted," she stated that she had not formed an opinion about the case and that she could fairly and impartially weigh the evidence presented.

*Treesh*, 90 Ohio St. 3d at 490.

This court agrees with that analysis and denies Treesh's sub-claim as neither contrary to nor an unreasonable application of United States Supreme Court law.  In determining whether the trial court erred in denying Treesh's for-cause challenges of Barth and Modica, this Court must ask: "did a juror swear that he could set aside any opinion that he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed?" *Patton*, 467 U.S. at 1036.  This is not a case like *Wolfe v. Brigano*, 232 F.3d 499 (6th Cir. 2000), where the court granted habeas corpus because two jurors had close and long-standing relations with the victim's family and admitted that they would have had difficulty setting aside those relationships and rendering a fair and impartial verdict in the case.  *Id.* at 502.  Here, Barth admitted to knowing the prosecutor (teacher of a paralegal course) and Modica admitted being aware of pre-trial publicity

81

in the case, but both unequivocally stated that they could set aside any opinions they might have and judge the case impartially based on the evidence and the judge's instructions.  (T. 1136-37, 1158-61, 1191-92). The jurors affirmative and believable statements that they could set aside any outside opinions they might hold rendered denial of Treesh's "for cause" challenge reasonable. That is all the Constitution requires. *Id.* at 503.

> d.      *Counsel failed to request a mistrial at various stages of the trial.*

The state court of appeals noted that Treesh failed to specify where a motion for mistrial should have been made, and Treesh continues that lack of specificity here:

> Additionally, appellant claims that his counsel failed to request a mistrial at various stages of the trial.  However, appellant does not provide any specific instances where such a motion should have been made; therefore, this argument is meritless.  Further, upon a review of the record, we note that appellant's counsel twice moved for a mistrial and both motions were overruled.

*Treesh*, No. 95-L-057 at *120-127 (11th Dist. Oct. 16, 1998).

This court agrees.  In this civil habeas action, Treesh bears the burden of demonstrating trial court constitutional error. *Jackson*, 443 U.S. at 324. He cannot meet that burden without specifying exact times that his counsel should have moved for dismissal but did not, and how that failure to move for dismissal resulted in a violation of his constitutional rights.  *Id.*

> e.      *Counsel erroneously withdrew the issue of the improper "show up" identification from the trial court's consideration at the suppression hearing.*

Counsel was not ineffective in withdrawing the "show up" identification claim – where only one suspect is presented for identification by a witness, as opposed to appearing in a line-up – in which Treesh admitted to participating in the robbery and shooting.  As the Ohio Supreme Court noted:

82

> Treesh's . . . contention, that counsel were ineffective for
> withdrawing the show-up identification portion of Treesh's
> motion to suppress is also meritless. Identity was never an issue
> in this case because appellant admitted both his participation in
> the robbery and his presence during the fatal encounter with
> Dupree at the rear of the store. Defense counsel's decision to
> withdraw the show-up identification issue was consistent with
> the defense, and Treesh has failed to demonstrate how it
> prejudiced him.

*Treesh*, 90 Ohio St. 3d at 490.

This court agrees. Treesh's identity as a shooter was never contested at trial. Indeed, it could

not be, as Treesh was followed from the scene and arrested at the end of the police chase after an

armed confrontation with police.

> f.    *Counsel failed to have the investigator who was hired to investigate the case on Treesh's behalf, Mark Angelotta, appear and testify at trial.*

The Ohio Supreme Court reasonably applied *Strickland* in according deference to counsels'

decision on who to call as a witness and in finding that Treesh failed to demonstrate any prejudice

from the failure to call Angelotta:

> Treesh argues that his attorney should have called Mark Angelotta – his
> court-appointed investigator – as well as Angelotta's wife, Terri, as defense
> witnesses. Generally counsel's decision whether to call a witness falls
> within the rubric of trial strategy and will not be second-guessed by a
> reviewing court. [*State v. Williams*, 74 Ohio App. 3d 686, 695 (1991)].
> Further, Treesh fails to explain how counsel's failure to call these two
> witnesses prejudiced him.

*Treesh*, 90 Ohio St. 3d at 490.

Trial strategy based on plausible options is virtually unchallengeable." *Wiggins*, 539 U.S.

at 521; *Bell*, 535 U.S. at 698 (judicial scrutiny of counsel's performance is highly deferential and

must apply a "presumption that under the circumstances, the challenged action 'might be considered

sound trial strategy'"). Treesh offers no explanation, i.e., a transcript or summary, suggesting that

83

trial counsels' failure to have Mark and Terri Angelotta testify is other than an exercise of reasonable trial strategy.  Under these circumstances, the court does not find that trial counsels' failure to call Treesh's investigators was ineffective assistance of counsel.  *See, e.g.*, *Austin v. Bell*, 126 F.3d 843 (6th Cir. 1997) (denying defendant's claim for ineffective assistance of trial counsel where defendant failed to show that counsel's decision not to call two witnesses was an unreasonable trial strategy).

> *16.[32]*    *Treesh Was Denied the Effective Assistance of Counsel in the Mitigation Phase of His Trial.*

In this claim, Treesh asserts the following sub-claims:

> a.    *Treesh's trial counsel failed to conduct a reasonable investigation in preparation for the mitigation phase of the trial, failed to effectively present a reasoned and compelling mitigation case, and failed in other significant respects, all of which singularly and in combination denied Treesh a fair and reliable sentencing determination.*
>
> b.    *Although counsel had a duty to conduct a thorough review of Treesh's background, they did not do so.  They violated the duty to perform a thorough pre-mitigation investigation by, among other things, failing to locate and interview numerous witnesses whose testimony was essential to a complete understanding of Fred Treesh.*
>
> c.    *Had Treesh received effective representation, his case would have included a thorough investigation, preparation, and proper presentation at the mitigation phase of the proceedings.*

It is difficult to see, and Treesh does not suggest, what additional investigation would have made counsel effective in presenting his mitigation claims.  During mitigation, counsel offered the expert testimony of psychologist Sandra McPherson, Ph.D., regarding Treesh's attention deficit/hyperactivity syndrome, which she linked to poor school performance and cocaine

---

[32]    This claim was only partially preserved for habeas review.  Nevertheless and in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred.  It did not.

dependence.  She linked his cocaine addiction to the possibility that it could impair his ability to conform his conduct within the law and his ability to appreciate the criminality of his conduct. Dr. McPherson related how the sexual abuse of Treesh's mother may have affected her discipline of the young Treesh.  She related that when combined with his attention deficit and hyperactivity, the three forces lessened Treesh's ability to behave acceptably in society.  (T. 2949- 2979).  Counsel also presented other evidence and arguments, including residual doubt and that the death was accidental. In addition, counsel presented an unsworn statement by Defendant denying any intentional killing and apologizing to Dupree's relatives. Treesh's parents, his older sister, the mother of his child, and his daughter each testified about the disruptive effect on their lives should death be imposed. Additionally, various family members testified that Treesh was hyperactive and experienced a dysfunctional childhood.

Treesh argues that counsel should have introduced more evidence of his criminal record that included several armed robberies as well as a sexual incident during one of them.  He also asserts that a neurologist should have been called to testify at his trial. Counsel consulted a neurologist but there was no evidence during post-conviction proceedings indicating what his trial testimony would have been.  Failure to call a neurologist may also have been a matter of trial strategy.

The Ohio Eleventh District Court of Appeals, in Treesh's post-conviction proceeding, found that counsels' decision not to include more evidence of prior criminal activity was a matter of trial strategy because such evidence could have jaundiced the jury's view of Treesh. *Treesh*, 1998 WL 964528 at * 5.  The evidence shows that Treesh's counsel conducted a thorough investigation and review of his background and of locating and interviewing witnesses for the mitigation phase of his trial.

85

As earlier noted, the reviewing court's scrutiny of counsels' performance is highly deferential. *Strickland*, 466 U.S. at 689. Indeed, "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. The court must also not indulge in hindsight, but must evaluate the reasonableness of counsels' performance within the context of the circumstances at the time of the alleged errors. *Id.* Applying these standards, and in light of Treesh's failure to specify how his counsel was ineffective in the mitigation phase of trial, this court cannot find trial counsel ineffective.

This is not a case like *Workman v. Tate*, 957 F.2d 1339, 1345-46 (6th Cir. 1992), where counsels' failure even to contact or call Wilkerson and Osborne, the two people accompanying Workman during the events which precipitated his arrest, was ineffective assistance that deprived him of a fair trial.[33] Counsels' "strategic choices made after thorough investigation of law and facts

---

[33]    Wilkerson and Osborne were the only witnesses, aside from Workman and the police officers, who saw what happened outside Mike's Hide-Away Tavern at 3:00 a.m. on March 8, 1986. The witnesses called to testify on Workman's behalf at trial were all inside the bar while the events that precipitated Workman's arrest occurred outside. A reasonable defense attorney would have recognized that, at least potentially, Wilkerson and Osborne were two very critical witnesses for Workman's defense. Furthermore, this was not a case where it was unlikely that further investigation would bear fruit, so that counsel's failure to investigate could be excused. *Cf. McFadden v. Cabana*, 851 F.2d 784, 789 (5th Cir.1988). Nor is this a case where the defendant gave counsel reason to believe that further investigation would be in vain. *Cf. Strickland, supra*, 466 U.S. at 691. Here, Workman informed counsel that he was with Wilkerson and Osborne as he left the bar and was arrested, and he informed counsel where they could be reached. Moreover, other witnesses, Gunnoe and the others who were inside the bar at the time of Workman's arrest, confirmed that Workman was with Wilkerson and Osborne as he left the bar. If counsel had interviewed these other witnesses prior to trial, counsel would have known that Wilkerson and Osborne were with Workman as he left the bar.

86

relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. "[C]ounsel has a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691.  Where counsel investigates and interviews promising witnesses, and determines that they would not be valuable in securing defendant's release, counsel's action is mere trial strategy, unreviewable in habeas corpus. *United States, ex rel. Cosey v. Wolff*, 727 F.2d 656, 658 n.3 (7th Cir.1984), *overruled on other grounds by United States v. Payne*, 741 F.2d 887 (7th Cir. 1984).

In this case, Treesh's counsel reasonably investigated Treesh's background and presented evidence that the jury could consider in mitigation of the death penalty. That is all that *Strickland* requires.  That the jury found that the mitigating factors presented did not outweigh the aggravating circumstances presented by the prosecution, does not render Treesh's counsel legally ineffective.

> d.    *Had a thorough investigation, preparation, and proper presentation of evidence at the mitigation phase occurred, additional evidence of mitigating factors would have been presented to the jury for their consideration in sentencing.  Among other things, counsel should have presented to the jury the testimony of a neurologist regarding the blow to the head Treesh had sustained while working as a heavy equipment operator several months before the crimes at issue, and the impact of that head injury on Treesh's subsequent criminal activity and heavy drug usage. Expert testimony on the effects of heavy cocaine usage, and in particular crack cocaine usage, over a prolonged period was also essential to place Treesh's criminal conduct in a context that would have made it reasonably probable that at least one juror would have decided in favor of life.*

Contrary to Treesh's assertion, Treesh's counsel introduced evidence on many of these points.  For instance, the Ohio Supreme Court noted as follows:

87

> The defense also presented the testimony of a psychologist, Dr. Sandra McPherson. McPherson testified that Treesh suffered from a "classic" case of attention deficit/hyperactivity syndrome ("ADHD"), depression, and cocaine addiction. According to McPherson, persons with ADHD have difficulty sitting still, completing their work, or remembering things; they may lack some social skills and suffer from low self-esteem. Mc Pherson testified that children with ADHD often receive negative feedback from teachers, and there is a high correlation between ADHD and drug use. McPherson testified that Treesh had a fourth-grade spelling ability, could read at a seventh-grade level, and could do mathematics  at a sixth-grade level.  Despite Treesh's poor achievement in school, McPherson testified that he tested in the normal range on IQ tests.

*Treesh*, 90 Ohio St. 3d at 492.  That information was borne out by the evidence at mitigation. (T. 2925-2940.)

During post-conviction review, the state court correctly determined that Treesh's claim of ineffective assistance of counsel – which was based on counsels' failure to call the neurologist, Dr. Brickel, to testify to the effect of an earlier blow to Treesh's head – was barred by *res judicata*:

> In fact, appellant's trial counsel submitted a bill to the court for compensation of expenses for work performed by Dr. Brickel.  The billing statement included an indication that Dr. Brickel performed tests on appellant, including an electroencephalograph (EEG) on December 29, 1994. Appellant has not introduced any evidence indicating that the results of those tests would have assisted the defense.

*State v. Treesh*, No. 97-L-080 at 11-12 (11th Cir. Ct. of App. Dec. 21, 1998).  Treesh repeats his error in the state courts on habeas review.  Other than a bald assertion that he suffered a head injury that  occurred before the crimes were committed, Treesh does not point to documents or affidavits suggesting to what exactly a neurologist would testify.  Under these circumstances, this court cannot assume that counsels' decision not to present Dr. Brickel's testimony was other than a strategic decision.  *See, e.g.*, *Strickland*, 466 U.S. at 689 (the reviewing court's scrutiny of counsel's performance is highly deferential); *Id.* at 690 (the court should recognize that counsel is strongly

88

presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment), *accord Bigelow*, 367 F.3d at 570; *Mallett*, 334 F.3d at 497; *McQueen*, 99 F.3d at 1311(the court must also not indulge in hindsight, but must evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors; trial counsel's tactical decisions are particularly difficult to attack and a defendant's challenge to such decisions must overcome a presumption that the challenged action might be considered sound trial strategy), *Cobb*, 832 F.2d at 347. Under these circumstances, then, there was no demonstrated ineffectiveness of counsel.

> e. *Counsel failed to make any effort to explain Treesh's history of criminal activity, a history about which the jury was obviously aware from the extensive pretrial publicity, the publicity post-verdict, and the "other acts" evidence that had been referenced during the trial. After Treesh was convicted, it was not reasonable for Treesh's counsel to proceed to mitigation with a strategy whose only goal was to keep Treesh's criminal record from the jury. By doing so, Treesh's counsel allowed the issue of Treesh's criminal history to become the proverbial elephant in the jury room that everyone knew about, but no one wanted to acknowledge. This was not reasonable and it was not in accordance with prevailing standards in capital cases. Such a mitigation case should have included the circumstances of his "crime spree," including the fact that the modus operandi that was documented from that spree was that Treesh and Brooks used duct tape to tie up their robbery victims; their method was not to shoot the victims.*

In a bizarre turnabout from claims 8(f) and 13 (that the prosecution improperly "leaked" this information to the jury), Treesh argues that his trial counsel were ineffective for failing to introduce evidence of Treesh's earlier crimes, including aggravated robberies and sexual assaults. Treesh's theory in this claim is that had counsel introduced evidence of those earlier crimes, the jury would have inferred that Treesh's "modus operandi" in those crimes included binding the victims with duct tape, stealing items from the victims, and leaving the victims alive and well when Treesh finished his work. No prior crime involved use of a gun or the death of the victim. This information, Treesh

89

alleges, would have helped to show that Treesh did not intend to kill Dupree, but was merely an accident in the course of a robbery. The state court of appeals determined that this claim was frivolous:

> In the present case, relying on Evid. R. 404(B), appellant's trial counsel successfully excluded any evidence or mention of appellant's prior crimes. We cannot conclude that this effort constituted a deficient performance by counsel. In one report, the victim of an armed robbery stated that a suspect matching appellant's general description told her "I'm going too splatter you." The victim further related that the appellant further exclaimed "I'm gonna kill everybody in the store." Moreover, in a statement describing another robbery that purportedly involved appellant, the victims also stated that a suspect matching appellant's description pulled down her pants and underwear and pulled their shirts and bras over their heads. One of these victims testified that one of the assailants also touched her vagina.

> Based on the prejudicial allegations we cannot conclude that the failure to attempt to develop this evidence constituted ineffective assistance of counsel. Appellant's trial counsel properly limited the inquiry at trial to the events of the night of the murder of Dupree. If counsel had pursued this line of questioning, the jury would have perceived appellant as one who not only committed numerous other armed robberies, but also was a sexual predator. In summary, appellant's trial counsel was not ineffective in deciding to exclude evidence of appellant's other acts, including armed robberies and sexual crimes. Therefore appellant has not demonstrated a sustained ground for relief on this basis.

*Treesh*, No. 97-L-080, 1998 WL 964528 *5 (11th App. Dist. Dec. 18, 1998).

This court agrees. There was as much (or more) prejudicial evidence in the recitation of Treesh's former crime spree as there was exculpatory evidence. Counsel could have determined that Treesh's prior history would have further inculpated Treesh rather than exculpated him. Trial counsel made a tactical choice in the evidence to present. These sorts of tactical decisions are rarely, if ever, grounds for reversal on ineffective assistance of counsel claims. *See, e.g.*, *McQueen*, 99 F.3d at 1311; *O'Hara v. Wiggonton*, 24 F.3d 823, 828 (6th Cir. 1994).

90

    20.[34]    *Treesh Was Denied His Constitutional Rights Because His Lead Trial Attorney Was Also Representing the Lead Detective in Treesh's Case in Another Matter, at the Same Time as Treesh's Case Was Pending.*

In this claim, Treesh argues that he was denied effective assistance of counsel because one of his two attorneys, John Hawkins, who was representing him in this capital case, was also representing Detective Thomas Doyle (a witness against Treesh) in divorce proceedings.  Treesh argues that he was prejudiced by this dual representation because Doyle's "misconduct" in the custodial interrogation of Treesh was raised in Treesh's motion to suppress and that any waiver of this conflict by Treesh was ineffective in that it was not made knowingly, intelligently, and with full knowledge of its implications. Treesh cites *Cuyler*, 446 U.S. at 350, to support his contention.  The court disagrees.

Defense counsel disclosed this fact on the record and Treesh affirmatively waived the potential conflict after questioning by the court. In relevant part, the following occurred at trial:

> Attorney Hawkins stated that he was presently representing Doyle in his divorce proceeding and that he and Doyle were social friends. However, Attorney Hawkins added that he and Doyle had been on opposite sides of cases in the past, including a capital murder case, and that he did not forsee a problematic conflict. At the hearing on this issue, both appellant and Doyle stated that they had no objection to Attorney Hawkins continuing to represent appellant. Additionally, the trial court had the following colloquy with appellant on this issue:
>
> THE COURT:         Mr. Treesh, do you understand what this is all about?
> THE DEFENDANT:  Yes, sir.
> THE COURT:         Do you understand the waiver of apparent conflict as indicated by your attorney?

---

[34]    This claim was not preserved for habeas review because it was not presented to the state courts in timely fashion.  Nevertheless, and in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred.  It did not.

91

THE DEFENDANT:  Yes, sir.

THE COURT:  For the record, I have in front of me, 'I, Frederick Treesh, acknowledge that I have been advised by my attorney, John Hawkins, that Mr. Hawkins represents Eastlake Detective Thomas Doyle in the domestic relations case Doyle v. Doyle, and I do further consent to John Hawkins continuing, along with James Ritts, as my trial counsel and furthermore, I am not requesting a change of counsel.

You would be entitled to a change of counsel if you so desire.  Do you desire a change of counsel at this time?

THE DEFENDANT:  No, sir, I have been aware of this from day one."

*State v. Treesh*, No. 97-L- 080, 1998 WL 964528 * 7 (Ohio App. 11th Dist. Dec. 18, 1998).

In *Cuyler*, counsel simultaneously represented three co-defendants in a murder case.  There the United States Supreme Court held that courts have a duty to inquire into possible conflicts of interest  when "the trial court knows or reasonably should know that a particular conflict exists." *Cuyler*, 446 U.S. at 347.  The Court further explained:

> that the [mere] possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance. Sullivan believes he should prevail even under this standard. He emphasizes [Attorney] Peruto's admission that the decision to rest Sullivan's defense reflected a reluctance to expose witnesses who later might have testified for the other defendants. The petitioner, on the other hand, points to DiBona's contrary testimony and to evidence that Sullivan himself wished to avoid taking the stand.

*Id.* at 350.

In Treesh's case, appellant has likewise advanced no argument indicating that Hawkins' purported conflict affected his representation of Treesh. On the contrary, the record indicates that Attorney Hawkins advanced a vigorous defense. Ohio Attorney Disciplinary Rules 5-105(A) and (B) describe

92

certain situations in which an attorney shall decline accepting a client. That rule then notes that: "[i]n the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

Here, counsel immediately disclosed his possible conflict and Treesh suggests no actual prejudice he suffered as a result of that conflict.  Indeed, the state court found that in light of Treesh's testimony and his written agreement to Waive Apparent Conflict, there was no irreconcilable conflict resulting from Hawkins' representation of Doyle in his divorce. *Treesh*, No. 97-L-080, 1998 WL 964528 *7 (11th Dist. Ct. App. Dec. 18, 1998).  There was far less likelihood of an unconstitutional conflict of interest in a case like this where the attorney is representing a witness in a completely separate civil case, than in a case like *Cuyler* where the attorneys represented co-defendants charged with the same crime; in the case of simultaneous representation of criminal co-defendants, it is easy to imagine irreconcilable conflicts as the defendants attempt to shift responsibility away from themselves onto their co-defendants. *See, e.g.*, *Holloway v. Arkansas*, 435 U.S. 475 (1978). This court will not, absent clear and convincing evidence otherwise, overturn a factual determination of the state court. 28 U.S.C. 2254 (e)(1). Treesh has not demonstrated any such clear and convincing evidence in this case. To the contrary, the trial court inquired closely of Treesh's understanding of the possible conflict and made him aware of his right to independent counsel.  Treesh declined the offer of independent counsel in open court and in writing. This claim is therefore dismissed.

### E. Constitutionality

21.[35]    *Requiring Treesh to Choose His Method of Execution Constitutes Cruel and Unusual Punishment.*

In 2001, the Ohio legislature modified the method of execution to lethal injection only. Thus, death row inmates no longer have to choose their method of punishment.  Ohio Rev. Code Ann. § 2949.22, as amended by 2001 H. 362.  *Hill v. Mitchell*, 400 F.3d 308, 328 (6th Cir. 2005). As Treesh raises no claim that execution by lethal injection is cruel and unusual punishment, this claim is denied.

24.[36]    *Ohio's Death Penalty Statute Is Unconstitutional in Numerous Respects.*

Treesh raises numerous reasons why Ohio's death penalty scheme is unconstitutional. The Respondent agrees that all of them have been presented to the state court and are therefore preserved for federal habeas review. Most, if not all, of these claims have already been rejected by the Sixth Circuit.[37]

*a. Death Penalty is Mandatory.*

A sentencer is constitutionally required to have information sufficient to enable it to consider the character and individual circumstances of a defendant prior to the imposition of the death sentence.  *Buell v. Mitchell*, 274 F.3d 337, 368 (6th Cir. 2001) (citing *Sumner v. Shuman*, 483 U.S. 66, 72 (1987)).  A sentence of death is not automatically imposed depending on certain types of

---

[35]    This claim was not preserved for habeas review because it was not presented to the state courts in timely fashion.  Nevertheless and in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred.  It did  not.

[36]    This claim is properly preserved for habeas review; the Respondent does not argue otherwise.

[37]    These claims will be discussed in the order presented in Respondent's Return of Writ.

murder.  *Blystone v. Pennsylvania*, 494 U.S. 299, 305 (1990).  As long as a death penalty is imposed after a determination that the aggravating circumstances outweigh the mitigating circumstances present in the particular crime committed by the particular defendant or that there are no mitigating circumstances, the sentence is constitutional.  *Id.*; *Buell*, 274 F.3d at 368; *Wiles v. Bagley*, 2005 WL 1181859 at * 42. (N.D. Ohio May 18, 2005).

> b. *Prosecutors Have Uncontrolled Discretion.*

In *Gregg v. Georgia*, 428 U. S. 153, 188 (1976), the Supreme Court set forth the following capital sentencing procedures likely to prevent arbitrary and capricious imposition of the death penalty: (1) consideration of a pre-sentence report by the sentencing authority; (2) jury sentencing where the jury is adequately informed and given meaningful standards to guide its use of the information; (3) a bifurcated guilt phase/sentencing phase trial; (4) weighing of aggravating circumstances and mitigating factors; (5) a sentencing decision based on specific findings and; (6) meaningful appellate review.  Ohio's death penalty statutes contain these preventative sentencing procedures.  *Buell*, 274 F.3d at 367.  *See Bryd*, 209 F.3d at 539.

> c. *Proof of Aggravating Circumstances at Guilt Phase.*

In *Coleman*, 268 F.3d at 433, the Sixth Circuit held that Ohio's scheme is consistent with *Lowenfield v. Phelps*, 484 U.S. 231, 244-45 (1988), wherein the Supreme Court stated:

> The use of "aggravating circumstances" is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase.

> d. *Ohio Criminal Rule 11(C)(3) Encourages Guilty Pleas.*

Ohio Criminal Rule 11(C)(3) allows a judge, in the interest of justice, to dismiss capital specifications if the defendant pleads guilty or no contest.  The specifications are not automatically dismissed.  If the judge does not dismiss the specifications, the rule requires three judges to determine if the offense was aggravated murder and, if so, they must determine the presence or absence of the specified aggravating circumstances, if any, compared to any mitigating circumstances and impose sentence accordingly.  In *United States v. Jackson*, 390 U.S. 570 (1968), the Supreme Court held unconstitutional a statute that automatically dismissed the capital specifications when a defendant plead guilty or waived a jury. The death penalty could be imposed if recommended by a jury, but the statute did not include a procedure for imposing the death penalty on a defendant who waived a jury or pled guilty.  However, the Supreme Court has never decided that a statute allowing a defendant to avoid the possibility of a death sentence with a guilty plea was invalid.  *Benge v. Johnson*, 312 F. Supp. 2d 978, 1033-34 (S.D. Ohio 2004); *Frazier v. Mitchell*, 188 F. Supp. 2d 798, 839 (N.D. Ohio 2001), *rev'd in part on other grounds by Frazier v. Huffman*, 343 F.3d 780 (6th Cir. 2003)*; Jamison v. Collins*, 100 F. Supp. 2d 647, 763 (S.D. Ohio 2000).  There is no *per se* rule against encouraging guilty pleas.  *Benge* , 312 F. Supp. 2d at 1034 (citing *Corbitt v. New Jersey*, 439 U.S. 212, 223 (1978)).  Under Ohio Criminal Rule 11(C)(3), a defendant who pleads guilty to an indictment containing a death penalty specification can still receive the death penalty.  *Id.*  The Sixth Circuit has rejected the same argument.  *See Cooey*, 289 F.3d at 924-25.

   *e. Ohio's Death Penalty Scheme Treats Felony-Murders More Harshly Than Premeditated Murders.*

Based on *Tison v. Arizona*, 481 U.S. 137 (1987), which held that the imposition of the death penalty on felony murders is not unconstitutional, the court finds that there is no merit to this claim, the adjudication of which did not result in a decision that was contrary to, or involved an

96

unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. *Hartman* v. *Bagley*, 333 F. Supp. 2d 632, 678 (N.D. Ohio 2004)*; Keene v. Mitchell,* 2004 WL 3325797 * 77 (S.D. Ohio Aug. 25, 2004); *see Frazier*, 188 F. Supp. 2d at 842 (treatment of death penalty murders more harshly than premeditated murders not unconstitutional because R.C. § 2929.04(A)(7) sufficiently narrows the class of homicides).

> *f.  Statutory Scheme Fails to establish a Standard by Which to Balance the Mitigating Factors    Against the Aggravating Factors.*

According to the Supreme Court, "the Eighth Amendment does not require states to adopt specific standards for instructing juries on mitigating circumstances." *Buchanan v. Angelone*, 522 U.S. 269, 274 (1998).   Thus, the absence of any standard to balance the weight of mitigating circumstances with aggravating circumstances is inconsequential. *Dickerson v. Mitchell*, 336 F. Supp. 2d 770, 791 (N.D. Ohio 2004), *rev'd on other grounds*, 453 F.3d 690 (6th Cir. 2006); *Hartman*, 333 F. Supp. 2d at 675; *Madrigal v. Bagley*, 276 F. Supp. 2d 780 (N.D. Ohio 2003).

> *g. Conscious Desire to Kill.*

The Constitution does not require a premeditated and conscious desire to kill before a death sentence can be imposed. *Tison*, 481 U.S. at 158; *Hartman*, 333 F. Supp. 2d at 677.

> *h. R.C § 2929.03(D)(1) Claim.*

Ohio Revised Code Section 2929.03(D)(1) provides in relevant part:

> Copies of any reports prepared under this division shall be furnished to the court, to the trial jury if the offender was tried by a jury, to the prosecutor, and to the offender or the offender's counsel for use under this division. The court, and the trial jury if the offender was tried by a jury, shall consider any report prepared pursuant to this division.

A defendant may also request a pre-sentence investigation or mental examination.  If he so requests, the resulting reports must be provided to the court, jury and the prosecutor.  The Supreme Court

found that this procedure enhances the search for the truth and does not render the proceedings unfair. *Williams v. Florida*, 399 U.S. 78, 82 (1970); *Frazier*, 188 F. Supp. 2d at 838. The Sixth Circuit has also rejected this claim without discussion. *Cooey,* 289 F.3d at 925-26; *Byrd*, 209 F.3d at 539. In *Keene*, 2004 WL 3325797 at *76 and *Jamison*, 100 F. Supp. 2d at 763-64, the courts denied relief on this issue reasoning that a defendant is not required to request a pre-sentence investigation report or a mental examination. Also, R.C. § 2929.024 allows a trial court to provide funds to an indigent defendant for investigative services, experts and other necessary services to prepare a defense. Since an indigent defendant is not required to utilize § 2929.03(D)(1), this procedure is not unconstitutional.

### i. State Not Required to Prove Absence of Mitigation

The Supreme Court rejected this argument in *Walton v. Arizona*, 497 U.S. 639, 650 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002) (overruling *Walton* to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty). A state law which places the burden of proving mitigating factors on the defendant is not *per se* unconstitutional as long as a state's methods of allocating the burdens of proof does not lessen the state's burden to prove every element of the offense charged, or to prove the existence of aggravating circumstances. A defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency. The state still has the burden to show the existence of aggravating circumstances that outweigh the existence of any mitigating factors. *Wiles*, 2005 WL 1181859 at * 43; *Madrigal*, 276 F. Supp. 2d at 780.

### j. Preponderance of Evidence in Mitigation Phase.

98

In *Walton*, 497 U.S. at 649-51, the Supreme Court wrote:

> So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency.

*Id*. at 650.  The prosecution must prove beyond a reasonable doubt that any aggravating circumstances outweigh any mitigating factors.  In addition, Ohio allows capital defendants "great latitude" in presenting mitigating evidence.  *See* Ohio Rev.Code § 2929.03(D)(1); *Jamison*, 100 F. Supp. 2d at 764-65.  Further, in *Buchanan*, 522 U.S. at 275-76, the Supreme Court held that the Eighth Amendment does not require the jury be instructed on the concept of mitigating evidence or on particular statutory mitigating factors, and that states are free to structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to it. *Smith*, 348 F.3d at 214.

    *k. No Consideration of Sympathy or Mercy.*

There is no anti-mercy requirement in the Ohio statutes. *California v. Brown*, 479 U.S. 538, 541 (1987). A jury may consider mercy but Ohio law does not mandate that a trial court give a mercy instruction. *Mapes*, 171 F.3d at 415-16; *Hartman*, 333 F. Supp. 2d at 677.

    *l. Ohio's Appropriateness Review is Flawed.*

After the sentencer has found that a defendant convicted of aggravated murder is eligible for the death penalty because one or more aggravating circumstances have been found beyond a reasonable doubt, a separate review of whether the aggravating circumstances outweigh the mitigating factors is conducted to determine the appropriateness of the death penalty. *Buell*, 274 F.3d at 368.  In cases involving offenses committed prior to January 1, 1995, both the court of

appeals and the Ohio Supreme Court are required to review the trial court's decision and also independently determine whether the sentence is proportionate, non-excessive and appropriate in accordance with the aggravating circumstances and mitigating factors. In offenses committed after that date, the Ohio Supreme Court has the sole responsibility. This requirement gives the sentencing authority sufficient information to enable it to consider the character and individual circumstances of the defendant.  The court in *Buell,* 274 F.3d at 368-69, found that this procedure sufficiently discerns who deserves the death penalty. *Benge*, 312 F. Supp. 2d at 1035-36; *Jamison*, 100 F. Supp. 2d at 765-66.

> ### m. Lowenfield Claim - Ohio Statutes Fail to Narrow Class of Persons Eligible for the Death Penalty.

In order to be considered constitutional, a capital sentencing scheme must "generally narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Lowenfield*, 484 U.S. at 244; *Zant v. Stephens*, 462 U.S. 862, 877 (1983); *Jackson v. Anderson*, 141 F. Supp. 2d 811, 849 (N. D. Ohio 2001).  In Ohio, the jury must find at least one aggravating circumstance before the death penalty may be imposed.  *Gregg*, 428 U.S. at 162-164.  By satisfying this requirement, the jury narrows the class of persons eligible for the death penalty according to an objective legislative definition.  *Zant*, 462 U.S. at 878; *Jackson v. Anderson*, 141 F. Supp. 2d at 849.  The narrowing function can be performed by the jury at either the sentencing phase or guilt phase of the trial.  *Lowenfield*, 484 U.S. at 245; *Jamison*, 100 F. Supp. 2d at 762.  Unless the aggravating circumstance is vague or otherwise impedes the requirement that sentencing determinations be individualized, a state can select any substantive criteria it wants to decide who is eligible for the death penalty. *California v. Ramos*, 463 U.S. 992, 1001 (1983).

100

*n. Proportionality Review.*

This claim is without merit because no proportionality review is required. *Buell v. Mitchell*, 274 F.3d at 368 (citing *Pulley v. Harris*, 465 U.S. 37, 44-51 (1984)). Since Ohio law requires proportionality review, the review must be consistent with constitutional requirements. *Dickerson*, 336 F. Supp. 2d at 789. A trial judge has the duty to reweigh the aggravating circumstances and mitigating circumstances before determining whether to impose a death sentence or a life sentence, R.C. § 2929.03(D)(3), and to state this finding in a separate opinion. R.C. § 2929.03(F). The judge must examine the state's proportionality review to determine whether the imposition of a death sentence on the petitioner is patently unjust or "shocks the conscience." The court is not to second guess the state court's comparison of other cases in which the death penalty was imposed. *Dickerson*, 336 F. Supp. 2d at 789; *Taylor v. Mitchell*, 296 F. Supp. 2d 784, 839 (N. D. Ohio 2003). Because proportionality review is not required by the constitution, states have a great latitude in defining the pool of cases used for comparison. *Wickline v. Mitchell*, 319 F.3d 813, 824 (6th Cir. 2003). The Sixth Circuit has held that by limiting proportionality review to previous cases wherein the death penalty has been imposed, the Ohio Supreme Court has complied with the latitude allowed. *Id.* at 824; *Buell*, 274 F.3d at 369.

*o. Cruel and Unusual Punishment.*

In *Gregg*, 428 U.S. at 179, the Supreme Court rejected the argument that the death penalty is cruel and unusual punishment. The most marked indication of society's endorsement of the death penalty for murder is the legislative response to the Supreme Court's decision in *Furman v. Georgia*, 408 U.S. 238 (1972). Since *Furman*, the legislatures of at least 35 states have enacted new statutes that provide for the death penalty for at least some crimes that result in the death of another

101

person.  The Congress of the United States, in 1974, enacted a statute providing the death penalty for aircraft piracy that results in death. These recently adopted statutes have attempted to address the concerns expressed by the Court in *Furman* primarily (i) by specifying the factors to be weighed and the procedures to be followed in deciding when to impose a capital sentence, or (ii) by making the death penalty mandatory for specified crimes. But all of the post-*Furman* statutes make clear that capital punishment itself has not been rejected by the elected representatives of the people. *Gregg*,  428 U.S. at 179-81. Ohio's death penalty statutes satisfy the concerns identified in *Furman.*

p. *Least Restrictive and No Compelling Interest.*

The Supreme Court held that it could not require a state legislature to select the least restrictive penalty as long as the penalty selected is not inhumanely cruel or disproportionate to the crime. Further, the Court in *Gregg* rejected this argument, finding that the death penalty serves compelling state interests and is not "invariably disproportionate to the crime" of murder. *Gregg*, 428 U.S. at 183, 187; *Williams v. Bagley,* 380 F.3d 932, 966 (6th Cir. 2004), *cert. denied*, 125 S. Ct. 1939 (2005); *Greer*, 264 F.3d at 690; *Madrigal*, 276 F. Supp. 2d at 809.

q. *Lethal Injection Is Cruel and Unusual.*

The Supreme Court has held the death penalty to be constitutional. *Gregg*, 428 U.S. at 179. And lethal injection has been held to be a constitutional method of execution. *Lagrand v. Stewart*, 133 F.3d 1253, 1264 (9th Cir. 1998).  According to the Ninth Circuit, lethal injection is used by 37 of the 38 states that have the death penalty, indicating a national consensus. *Cooper v. Rimmer*, 379 F.3d 1029, 1033 (9th Cir. 2004).  Recently, the Sixth Circuit commented that at this time, lethal

102

injection is the law of the republic. *Alley v. Little*, 2006 WL 1313365 * 1 (6th Cir. May 12, 2006). No federal court has found the lethal injection protocol to be unconstitutional.  *Id.*[38]

     *r. Ohio Statutes Violate International Law.*

     There is no indication that international law influences rulings under the federal constitution regarding the death penalty.  In *Stanford v. Kentucky*, 492 U.S. 361, 391 (1989), the dissent relied partly on the decisions of respected organizations such as those mentioned by Treesh.  But the majority, although not expressly stating, appeared to reject the dissent's reliance on international law holding that the execution of juveniles was constitutional and that "no modern societal concerns" forbids the imposition of the death penalty on individuals as young as sixteen. *Buell*, 274 F.3d at 375; *Madrigal,* 276 F. Supp. 2d at 809-10.

     In *Jamison*, 100 F. Supp. 2d at 766-67, the court also considered organizations mentioned by Treesh in determining that international law does not preclude the State of Ohio from establishing and carrying out a capital punishment scheme.  Since about 90 countries still maintain the death penalty, no international law exists that supports the prohibition of the death penalty.  *Id.* The countries that have abolished the death penalty have done so for moral, political or other reasons than out of a sense of legal obligation. *Buell*, 274 F.3d at 373.   Abolition of the death penalty is not a customary norm of international law.  *Id.*  Any reaction by the United States to a violation of law is a domestic question belonging to the executive or legislative branches.

---

    [38]    This issue was raised in the Sixth Circuit in *Cooey v. Bradshaw*, 03-4001. However, on March 2, 2007, this case was dismissed as barred by the statute of limitations.  *Cooey v. Strickland,* 2007 WL 623482 (6th Cir. March 2, 2007).

25.[39]    *The Ohio Death Penalty Scheme is Unconstitutional as Applied to Treesh.*

Treesh reiterates his proportionality and various other claims of unconstitutionality of Ohio's death penalty statute raised in his twenty-fifth ground for relief. As previously discussed, his claims of the unconstitutionality of Ohio's death penalty statutes have no merit.

26.[40]    *Petitioner's Conviction and Sentence Are Unconstitutional Because of the Cumulative Effect of the Many Errors That Occurred During His Trial and in All Subsequent Proceedings.*

As none of Treesh's constitutionality claims are meritorious, his claim of the cumulative effect of all of the claims lacks merit. Moreover, the Sixth Circuit has recently held, "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorrain*e, 291 F.3d at 447.[41]

As Treesh has demonstrated no constitutional infirmity with the Ohio death penalty statute on its face or as applied, his claims for habeas relief are denied.

## VI. MOTION FOR EVIDENTIARY HEARING

Finally, Treesh asks that this court conduct an evidentiary hearing on his constitutional claims. As demonstrated by this Opinion, the court requires no additional evidence to render its opinion. Accordingly, the court denies Treesh's Motion for Evidentiary Hearing. (ECF No. 67).

## VII.    CONCLUSION

---

[39]    This claim is properly preserved for habeas review; the Respondent does not argue otherwise.

[40]    This claim is properly preserved for habeas review; the Respondent does not argue otherwise.

[41]    The court acknowledges that, in a later case, the Sixth Circuit granted habeas relief on cumulative error grounds. *DePew v. Anderson*, 311 F.3d at 751. Because the *DePew* petitioner had filed his petition prior to the AEDPA's effective date, however, the AEDPA provisions did not apply. *Id.* at 748.

104

### CERTIFICATE OF APPEALABILITY

Pursuant to the AEDPA, Congress amended 28 U.S.C. § 2253 and Fed. R. App. P. 22 to require a certificate of appealability ("COA"), instead of a certificate of probable cause. *See* 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b).  A COA may issue only if the applicant has made a substantial showing of the denial of a "constitutional" right.  *See* § 2253(c)(2); *Tennard v. Dretke*, 542 U.S. 274, 282 (2004). The Supreme Court has interpreted this standard to require that the "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.* (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).   The COA shall specify which specific issue or issues satisfy this standard. *See* § 2253(c)(3); *Castro v. United States*, 310 F.3d 900, 903-04 (6th Cir. 2003).  Under § 2253(c)(1)(A), a COA must issue in all appeals from a final judgment dismissing a § 2254 habeas petition where the detention complained of arises out of process issued by a state court.  A COA may also be required in an appeal from an order denying bail pending disposition of a § 2254 habeas petition, *Lee v. Jabe*, 989 F.2d 869, 870-71 (6th Cir. 1993), from an order denying a Fed. R. App. P. 4(a)(6) motion to reopen the time to appeal, *Greenawalt v. Stewart*, 105 F.3d 1268, 1272 (9th Cir. 1997), and also from an order denying a Fed. R. Civ. P. 60(b) motion to vacate an order dismissing a petition for writ of habeas corpus, *Kellogg v. Stack*, 269 F.3d 100, 103 (2d Cir. 2001) (and cases cited there).  Although review of the dismissal or grant of the petition is reviewed under a pre-AEDPA standard if the petition was pending on the statute's effective date, the appellate court shall apply a post-AEDPA standard for determining whether a certificate of appealability should issue, if the notice of appeal is filed after the statute's effective date (April 24, 1996).  *Slack,* 529 U.S. at 482-483.

Despite some conflicting language found in § 2253(c)(1) and Fed. R. App. P. (b), the Sixth Circuit has clarified that a district court is fully authorized to issue a COA under § 2253(c)(1). *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1070 (6th Cir. 1997), *overruled in part on other grounds by Lindh v. Murphy*, 521 U.S. 320 (1997).  Indeed, the appellant is required to ask the district court for a COA in the first instance.  *Kincade v. Sparkman*, 117 F.3d 949, 953 (6th Cir. 1997).  If the district court declines to certify any issue for appeal, the petitioner may seek a COA from the court of appeals as to any issue not so certified.  *Lyons v. Ohio Adult Parole Authority*, 105 F.3d at 1074.  In the absence of a formal motion, the court of appeals will construe the filing of the notice of appeal as a request for a COA as to any uncertified issues.  *Kincade*, 117 F.3d at 953.  A district court cannot refuse to issue a COA ruling until the petitioner files a motion requesting a certificate, *Castro v. United States*, 310 F.3d 900, 901-03 (6th Cir. 2002); indeed, the court can foreseeably issue a COA ruling when it issues its opinion or when the notice of appeal is filed.  *Id.* at 903.

Previously, the standard for granting a certificate of probable cause required an applicant to make a "substantial showing of the denial of [a] federal right." *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983).  While the words "substantial showing" remain the same with respect to the former certificate of probable cause and the current COA, Congress now requires a denial of a "constitutional" right, whereas before, the courts required a denial of a "federal" right.  The Supreme Court has given "due note" to the substitution of the word "constitutional." *Slack*, 529 U.S. at 483-84.

106

When a district court denies a habeas petition on the merits of the claims, a certificate may issue if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Slack*, 529 U.S. at 484.

A COA does not require a showing that the appeal will succeed on any claim. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003). "It is consistent with § 2253 that a COA will issue in some instances where there is no certainty of ultimate relief. After all, when a COA is sought, the whole premise is that the prisoner 'has already failed in that endeavor.'" *Id.* (quoting *Barefoot*, 463 U.S. at 893, n.4). The inquiry merely requires a threshold showing that jurists of reason could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further. *Id.* at 336. "Deciding the substance of an appeal in what should only be a threshold inquiry undermines the concept of a COA. The question is the debatability of the underlying constitutional claims, not the resolution of that debate." *Id.* at 342.

Even if improvidently granted, a COA vests jurisdiction in the Sixth Circuit. *Porterfield v. Bell*, 258 F.3d 484, 485 (6th Cir. 2001). The court of appeals ordinarily will not review the district court's decision concerning the COA. *Id.* But where the district court has not engaged in an individualized assessment of the issues and the parties have not briefed the case, the district court's decision concerning the certificate can be reviewed. *Id.* The blanket grant of a COA on every issue in a death penalty case is improper; the issues must be considered individually. *Frazier*, 343 F.3d at 788. Similarly, the blanket denial of a COA is improper; individualized consideration is necessary. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001). In a case where the district court issued its decision before *Porterfield* was decided and the parties had already briefed the merits of

107

the case, the Sixth Circuit did not order a remand which would have further delayed an already lengthy process. *Frazier*, 343 F.3d at 788.

      If a claim has been procedurally defaulted, an additional factor must be determined.  When a claim has been denied on procedural grounds without a ruling on the underlying claim, a COA will be issued only if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

      Claims fourteen, part of sixteen, twenty, twenty-one, twenty-two, twenty-three, and twenty-seven are procedurally defaulted.  They are all barred by the doctrine of *res judicata*. The court finds that reasonable jurists would not debate the defaulted status of these claims.  Thus, a COA is denied as to these claims.

      If the court were to have considered the fourteenth claim, it would have found that jurists of reason would debate this court's decision on the merits.  If a blood spatter expert had been hired, it might have proved or corroborated Treesh's version of the facts that the shooting was accidental. However, because no jurists of reason would debate that this claim has been procedurally defaulted, a COA is denied as to this claim.

      If the court were to have considered the twentieth claim for relief (attorney conflict), it would find that jurists of reason would debate this court's decision on the merits.  Although counsel immediately disclosed his possible conflict and Treesh appeared to waive any conflict, the court finds that simultaneous representation of a criminal defendant and an important adverse witness could constitute a constitutional violation.  However, because no jurists of reason would debate that this claim has been procedurally defaulted, a COA is denied as to this claim.

108

If the court were to have considered part of the sixteenth, twenty-first, twenty-second, twenty-third, and twenty-seventh claims, it would have found that jurists of reason would not debate this court's decision on the merits.

The court finds that jurists of reason would not debate this court's decision as to the portion of Treesh's sixteenth claim regarding his cocaine usage, social history, and counsels' failure to call a neurologist.  Sufficient evidence on the first two issues was presented to the jury and Treesh has not shown how further investigation would have aided his defense.  There was nothing before the court indicating what evidence would have been elicited from a neurologist.

The court found in the twenty-first claim (requiring Treesh to choose the method of execution) that death row inmates no longer have to choose their method of punishment.

If the court were to have considered the twenty-second claim (denial of discovery and assistance of blood spatter expert and neurologist), it would find that jurists of reason would not debate this court's decision. The court determined that the evidence showed that no struggle occurred between Treesh and the victim and that Treesh did not indicate how the results of tests performed by the neurologist would have assisted the defense.

If the court were to have considered the twenty-third claim (failure to sequester the jury between phases of trial and conduct a *voir dire* upon their return), it would find that jurists of reason would not debate this court's decision.  Before releasing the jury to the community following the guilt phase of trial, the judge properly instructed the jury.

Treesh alleged in his twenty-seventh claim that he was actually innocent.  The court found that Treesh has offered no new facts that "unquestionably establish [his] innocence. Therefore, jurists of reason would not debate this court's decision.

As to Treesh's preserved claims, the court finds that jurists of reason would not debate this court's decision as to Treesh's first claim for relief (pretrial publicity). The court found that each of the potential jurors ultimately seated on Treesh's jury was questioned, and those who recalled reports of the crime and the circumstances of the crime indicated his/her ability to lay that knowledge aside and judge Treesh's case solely on the evidence and law presented before them.

The court finds that jurists of reason would debate this court's decision as to the second ground for relief (*Miranda* violation). First, there is a question about whether Treesh received the *Miranda* warnings when arrested and validly waived them. Second, if he received the warnings when arrested, a question arises as to whether he was deprived of his constitutional rights when the subsequent warning was defective. A COA is granted as to this claim.

The court finds that jurists of reason would not debate this court's decision as to the third (*Brady* violation) and fourth (destruction of evidence) claims for relief. The court found a lack of evidence to support these claims.

The court finds that jurists of reason would not debate this court's decision as to Treesh's fifth claim for relief (refusal to allow access to grand jury proceedings) as he has not shown a particularized need for the material.

As to the sixth claim for relief (failure of court to provide daily transcripts), the court found that Treesh has not shown that his case was so complicated or extended that his lawyers were required to submit briefs or proposed findings that might justify a need for daily transcripts. Therefore, jurists of reason would not debate this court's decision.

As to the seventh claim for relief (additional peremptory challenges rejected), the court determined that the Supreme Court does not mandate a certain minimum number of peremptory

110

challenges even in death penalty cases.  The number of peremptory challenges in a death penalty case is left to the state.  Thus, jurists of reason would not debate this court's decision as to this claim.

The court finds that jurists of reason would not debate this court's decision as to Treesh's eighth claim for relief (prosecutorial misconduct in the guilt/innocence phase of the trial). After review of all of the sub-claims the court found that the prosecutor's conduct was non-prejudicial.

The ninth claim for relief involves Treesh's claim that he was denied the right to an impartial jury when a juror expressed her view that the death penalty was always appropriate in a murder case. The court found that the juror later expressed her misunderstanding of the question put to her and the process followed in death penalty cases and agreed that she could follow the judge's instructions and consider a penalty less than death if the circumstances of Treesh's case warranted a lesser penalty. Thus, jurists of reason would not debate this court's decision in finding this claim to be without merit.

The court finds that jurists of reason would not debate this court's decision as to Treesh's tenth and nineteenth claims for relief (insufficiency of the evidence and aggravating circumstances do not outweigh the mitigating factors).  The court reviewed the evidence finding that sufficient evidence existed to support the jury's verdict. Thus, jurists of reason would not debate this court's decision in finding this claim to be without merit.

In his eleventh claim for relief, Treesh alleged that the State improperly solicited testimony from its own witness about his invocation of his right to counsel. The court agreed with the state court's decision that although it was improper for the prosecutor to elicit testimony that Treesh asked for an attorney, the testimony was not prejudicial because the trial court gave a curative

111

instruction. Thus, jurists of reason would not debate this court's decision in finding this claim to be without merit.

In his twelfth claim for relief, Treesh alleged that the court improperly admitted prejudicial photographs. The court finds that jurists of reason would not debate this court's decision because the photographs' probative value substantially outweighed the danger of unfair prejudice to Treesh.

The court finds that jurists of reason would not debate this court's decision as to Treesh's thirteenth claim for relief (State's improper reference to Treesh's prior criminal record and other acts). The court found that the Ohio Supreme Court's determination that there was no reversible error in the prosecutor's reference to Treesh's prior convictions on cross-examination because the prosecutor simply sought confirmation of those convictions that Treesh admitted on direct examination, because the trial court properly sustained an objection, and because the reference did not deprive Treesh of a fair trial, was not contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

The court finds that jurists of reason would not debate this court's decision as to Treesh's fifteenth claim for relief (ineffective assistance of counsel for 1) failing to object to the use of the word "recommendation" in connection with the sentencing determination, 2) failure to object to the trial court or prosecutor instructing the jury that "for the petitioner to receive the death penalty, it would be necessary for the jury to find the petitioner guilty of aggravated murder and at least one specification," 4) failure to request a mistrial at various stages of the trial, 5) erroneous withdrawal of the issue of the improper "show up" identification from the trial court's consideration at the suppression hearing, and 6) failure to have the investigator who was hired to investigate the case on Treesh's behalf appear and testify at trial. The use of the term "recommendation" and the

112

statement that "for the petitioner to receive the death penalty, it would be necessary for the jury to find the petitioner guilty of aggravated murder and at least one specification," are correct statements of Ohio law and are constitutional; the jurors' affirmative and believable statements that they could set aside any outside opinions they might hold rendered denial of Treesh's "for cause" challenge reasonable; Treesh did not specify where a motion for mistrial should have been made; show up identification was not necessary as Treesh's identity as a shooter was never contested at trial, and it could not have been contested as Treesh was followed from the scene and arrested at the end of the police chase after an armed confrontation with police; and counsels' decision not to call the investigator to testify at trial was a matter of trial strategy.

The court finds that jurists of reason would debate this court's decision as to sub-claim (c) of Treesh's fifteenth claim for relief, (failure to rehabilitate favorable jurors and failure to timely object to unfounded challenges for cause by the State). Jurists could find that Juror Cynthia Barth would have been unable to set aside the fact that she had taken paralegal classes taught by the prosecutor so as to render a fair and impartial verdict, and that therefore denial of Treesh's "for cause" challenge was unreasonable. A COA is granted as to this sub-claim.

Part of the sixteenth claim concerning failure to introduce more of Treesh's criminal record was not defaulted. The court determined that counsels' decision not to include more evidence of prior criminal activity was a matter of trial strategy because such evidence could have jaundiced the jury's view of Treesh. Thus, the court finds that jurists of reason would not debate this court's decision on this claim.

In his seventeenth claim for relief, Treesh alleged that the court improperly allowed impact evidence and allowed a plea for the death penalty by the victim's family. The court finds that jurists

113

of reason would not debate this court's decision because impact testimony is not unconstitutional and the jury did not hear the family's sentence recommendation.

In his eighteenth claim for relief, Treesh alleged that the trial court's refusal to allow an important witness to testify for Treesh during the mitigation phase denied Treesh a fair trial. The court finds that jurists of reason would not debate this court's decision because the jury had before it the information it needed to assess Treesh's likelihood of future dangerousness, the witness's testimony was cumulative and Treesh suffered no prejudice from its exclusion.

The court finds that jurists of reason would not debate this court's decision as to Treesh's twenty-fourth and twenty-fifth claims for relief (Ohio's death penalty is unconstitutional in many respects and as to Treesh). All of these issues have been raised many times in other cases and have been found to be without merit.

In his twenty-sixth claim for relief Treesh alleges that the cumulative effect of the many errors in his case require granting of his Petition.  The court finds that jurists of reason would not debate this court's decision as to this claim because no errors have been found and the Sixth Circuit has noted that the Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief.

Accordingly, for the foregoing reasons, Treesh's Petition for Writ of Habeas Corpus is denied.  The Petition is hereby dismissed.

The court hereby GRANTS a Certificate of Appealability pursuant to 28 U.S.C. § 2253(c) as to Treesh's second and fifteenth (sub-claim (c)) claims as noted in the above certificate of appealability analysis.  The court finds that none of the other claims are debatable among jurists of

114

reason as no other ground for relief comes close to presenting a federal constitutional or legal violation.  As to the defaulted claims, the court finds that jurors of reason would not find the court's decision to be debatable on the procedural grounds, but that jurists of reasons would debate the court's decision on the merits as to the fourteenth and twentieth claims.  Consequently, the court DENIES a COA as to all other claims for relief.

IT IS SO ORDERED.


*/S/SOLOMON OLIVER, JR.*
UNITED STATES DISTRICT JUDGE


March 31, 2007